176 P.3d 33

**1800 OCOTILLO, LLC, an Arizona limited liability company, Plaintiff/Appellant,**

v.

**The WLB GROUP, INC., an Arizona corporation, Defendant/Appellee.**

**No. 1 CA–CV 07–0037.**

Court of Appeals of Arizona, Division 1, Department B.

Jan. 29, 2008.

Review Granted June 3, 2008.

---

467

Tiffany & Bosco, P.A. By Dow Glenn Ostlund, Tracy S. Morehouse, Phoenix, Attorneys for Appellant.

Bonnett, Fairbourn, Friedman & Balint, P.C. By Jerry C. Bonnett, Meredith L. Vivona, Phoenix, Attorneys for Appellee.

## OPINION

TIMMER, Judge.

¶ 1 1800 Ocotillo, LLC ("Ocotillo") appeals the trial court's grant of partial summary judgment in favor of The WLB Group, Inc. ("WLB") and the trial court's order limiting Ocotillo's recoverable damages to the fees Ocotillo has already paid to WLB. We must decide whether Arizona's public policy prohibits enforcement of a contractual provision that limits the liability of a design professional for its sole negligence and, if not, whether a jury must always decide the enforceability of such a provision pursuant to Article 18, Section 5, of the Arizona Constitution. For the reasons that follow, we conclude that public policy does not prohibit the enforcement of such provisions and that enforceability must be decided by a jury. We therefore reverse the partial summary judgment and remand for additional proceedings.

## BACKGROUND[1]

■ ¶ 2 Ocotillo is a real estate developer who, in 1998, commenced development of a townhouse project in Phoenix on property bounded on one side by the Arizona Canal. In November of that year, Ocotillo agreed to pay WLB $26,970 in exchange for WLB's provision of surveying, engineering, and landscape architecture services to the townhouse project. Ocotillo authorized its design-build contractor, Morris Building and Management, Inc. ("Morris Building"), to sign the contract with WLB. WLB sent the contract to Morris Building via facsimile and attached a page to the contract entitled "Standard Conditions." Although the conditions were set forth in small print and were largely illegible, Morris Building separately signed the page evidencing its agreement to these terms, including the following limitation-of-liability provision:

> 7. Client agrees that the liability of WLB, its agents and employees, in connection with services hereunder to the Client and to all persons having contractual relation-

ships with them, resulting from any negligent acts, errors, and/or omissions of WLB, its agents, and/or employees is limited to the total fees actually paid by the Client to WLB for services rendered by WLB hereunder.

The parties never discussed this provision prior to execution of the contract.

¶ 3 In January 2000, Ocotillo entered into a supplemental contract with WLB for provision of additional services in exchange for payment of $28,000 to WLB. The supplemental contract incorporated the 1998 contract. As before, the parties did not discuss a limitation-of-liability provision prior to execution of the supplemental contract.

¶ 4 Pursuant to the terms of the contract and supplemental contract (collectively, the "Contract"), WLB prepared a survey purportedly depicting the boundaries of the townhouse project property and all claimed rights-of-way affecting the property. This survey, however, failed to accurately identify an existing right-of-way owned by Salt River Project and Salt River Valley Water Users Association (collectively, "SRP"), the entity charged with managing the Arizona Canal. WLB prepared improvement drawings and a final plat based on this erroneous survey. After SRP disputed the final plat due to the inaccurate depiction of its right-of-way, the City of Phoenix refused to issue needed construction permits. Moreover, after SRP's right-of-way was properly identified, Ocotillo was required to procure a redesigned site layout and property improvements from other engineering and survey firms.

¶ 5 In December 2000, Ocotillo sued WLB for breach of contract and professional negligence and asserted entitlement to any surety bond or insurance WLB possessed.[2] WLB counterclaimed for unpaid fees and sought a declaratory judgment regarding the enforceability of the limitation-of-liability provision set forth in the Contract.

1. We view the evidence and all reasonable inferences in the light most favorable to Ocotillo as the party against whom partial summary judgment was entered. *Walk v. Ring,* 202 Ariz. 310, ¶ 3, 44 P.3d 990 (App.2002).

2. Ocotillo later filed an amended complaint naming additional defendants, who are not parties to this appeal.

¶ 6 In July 2002, the trial court granted partial summary judgment for WLB on Ocotillo's breach-of-contract claim and additionally ruled that the limitation-of-liability provision in the Contract was unenforceable as against public policy. After WLB filed a second motion for partial summary judgment in March 2004 regarding the validity of the limitation-of-liability provision, the court reconsidered its prior ruling and decided the provision was enforceable. Finally, in November 2006, after WLB filed a third motion for partial summary judgment, the court entered judgment pursuant to Arizona Rule of Civil Procedure ("ARCP") 54(b), declaring that the limitation-of-liability provision was enforceable and that any damages due to Ocotillo for professional negligence were capped at $14,242, the amount Ocotillo actually paid to WLB under the Contract. This timely appeal followed.

## DISCUSSION

¶ 7 Summary judgment is appropriate when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." ARCP 56(c). Summary judgment should be granted "if the facts produced in support of the claim or defense have so little probative value, given the quantum of evidence required, that reasonable people could not agree with the conclusion advanced by the proponent of the claim or defense." *Orme Sch. v. Reeves,* 166 Ariz. 301, 309, 802 P.2d 1000, 1008 (1990). For a claim or defense to withstand a motion for summary judgment, the proponent of the claim or defense must present evidence "from which a reasonable jury could find, directly or by inference, that the probabilities favored the proponent." *Id.* at 310, 802 P.2d at 1009. If the evidence would allow a jury to resolve a material issue in favor of either party, summary judgment is improper. *United Bank of Ariz. v. Allyn,* 167 Ariz. 191, 195, 805 P.2d 1012, 1016 (App. 1990). We determine de novo whether genuine issues of material fact exist and whether the trial court erred in its application of the law. *Unique Equip. Co. v. TRW Vehicle Safety Sys., Inc.,* 197 Ariz. 50, 52, ¶ 5, 3 P.3d 970, 972 (App.1999).

¶ 8 Ocotillo argues the trial court erred by entering partial summary judgment in favor of WLB because (1) the limitation-of-liability provision is void as against public policy, (2) alternatively, the enforceability of the provision is an issue of fact that must be submitted to the jury, and (3) even assuming the provision is valid as a matter of law, the court erred by capping the damage award against WLB at $14,242.

## I. Public policy

¶ 9 Ocotillo acknowledges that in appropriate circumstances, limitation-of-liability provisions in commercial contracts are enforceable. *See Salt River Project Agric. Improvement & Power Dist. v. Westinghouse Elec. Corp.,* 143 Ariz. 368, 385, 694 P.2d 198, 215 (1984) ("*SRP v. Westinghouse*") (reversing summary judgment in products liability action as fact issues existed regarding enforceability of limitation-of-liability provision), *abrogated on other grounds by Phelps v. Firebird Raceway, Inc.,* 210 Ariz. 403, 111 P.3d 1003 (2005); *Central Alarm of Tucson v. Ganem,* 116 Ariz. 74, 78, 567 P.2d 1203, 1207–08 (App.1977) (upholding a provision limiting liability for alarm company negligence to a sum equal to six months of rental service). As our supreme court has recognized, in commercial settings, business entities can legitimately "bargain over which party is to bear the risk of damage [from prospective negligence] and set the price accordingly, thus achieving a more rational distribution of the risk than the law would otherwise allow." *SRP v. Westinghouse,* 143 Ariz. at 383, 694 P.2d at 213. To be enforceable, however, there must be "no public policy impediment to the limitation," the parties must have bargained for the limitation, and the provision must be strictly construed against the party seeking its enforcement. *Id.; Morganteen v. Cowboy Adventures, Inc.,* 190 Ariz. 463, 465–66, 949 P.2d 552, 554–55 (App.1997). Ocotillo argues that public policy in Arizona prohibits enforcement of limitation-of-liability provisions in professional service contracts, such as the Contract at issue in this case.

## A.

¶ 10 As evidence of Arizona's public policy against limitation-of-liability provisions in professional service contracts, Ocotillo relies first on Arizona Revised Statutes ("A.R.S.") section 10–2234 (2004), which provides as follows:

> A shareholder of a professional corporation is personally and fully liable and accountable for any negligent or wrongful act or misconduct committed by the shareholder or by any person under the shareholder's direct supervision and control while rendering professional services on behalf of the professional corporation to the person for whom the professional services are rendered. The liability of a shareholder of the professional corporation is several only, and a shareholder is not vicariously responsible for the liability of another shareholder.

Ocotillo argues that the legislature's refusal to permit a professional to shield himself or herself from liability by incorporating as a professional corporation, coupled with the legislature's failure to affirmatively authorize a professional to limit liability to clients for professional negligence, evidences a public policy that limitation-of-liability provisions in professional service contracts are unenforceable.

¶ 11 We do not agree that A.R.S. § 10–2234 reflects a public policy prohibiting use of limitation-of-liability provisions in all professional service contracts. The plain language of § 10–2234 does not prohibit such provisions. *See Calmat of Ariz. v. State ex rel. Miller,* 176 Ariz. 190, 193, 859 P.2d 1323, 1326 (1993) (acknowledging that courts first review statute's language to determine legislative intent). Additionally, enforcement of such provisions would not be inconsistent with prohibiting professionals from completely and unilaterally immunizing themselves from liability merely by incorporating as professional corporations. Finally, assuming the

legislature intended to create a public policy prohibiting limitation-of-liability provisions in professional service contracts, we would not expect it do so by enacting a statute that applies only to professional corporations. *State ex rel. Martin Brannan v. Williams,* 217 Ariz. 207, 210, ¶ 8, 171 P.3d 1248, 1251 (App.2007) (gleaning legislative intent from placement of contested statute within Arizona Revised Statutes); *McMann v. City of Tucson,* 202 Ariz. 468, 473, ¶ 14, 47 P.3d 672, 677 (App.2002) (same). Rather, we would expect the legislature to place such an expression of policy in statutes governing particular professionals rather than in statutes addressing one manner in which professionals practice their crafts.[3] As WLB notes, professionals are not required to operate in professional corporations. Indeed, WLB is incorporated under Arizona's general corporation provisions, A.R.S. §§ 10–201 to –208, –220 to –226 (2004), and we take judicial notice that professionals also operate within partnerships and sole proprietorships.

¶ 12 At oral argument before this court, Ocotillo asserted that the public policy of Arizona has always been to prohibit professionals from limiting their liability for negligence. Consequently, according to Ocotillo, the legislature enacted A.R.S. § 10–2234 only to ensure continuance of this policy while simultaneously permitting professionals to conduct business as professional corporations. To support this argument, Ocotillo relies on *SRP v. Westinghouse,* which stated that "[t]he law does not look with favor upon one exacting a covenant to relieve himself of the basic duty which the law imposes on everyone: that of using due care for the safety of himself and others. This would tend to encourage carelessness." 143 Ariz. at 382, 694 P.2d at 212 (quoting *Union Pac. R.R. Co. v. El Paso Natural Gas Co.,* 17 Utah 2d 255, 259, 408 P.2d 910, 913 (1965)). But the court did not direct its statement solely to professionals and, re-

---

3. As Ocotillo correctly points out in a supplemental citation of authorities submitted to this court after oral argument, the legislature enacted a statute similar to § 10–2234 in provisions governing limited liability corporations. *See* A.R.S. § 29–846 (1998) (providing in relevant part that "[e]ach member, manager or employee perform-

ing professional services shall remain personally liable for any results of the negligent or wrongful acts, omissions or misconduct committed by him or by any person under his direct supervision and control while performing professional services on behalf of the limited liability company").

gardless, went on to recognize that such disclaimer provisions are permissible in cases not involving the public interest or statutory prohibition, although such provisions are strictly construed against the party seeking enforcement. *Id.* at 383, 694 P.2d 198, 694 P.2d at 213. Thus, we do not view *SRP v. Westinghouse* as evidencing a public policy prohibiting limitation-of-liability provisions for all professionals. Additionally, if the legislature intended A.R.S. § 10–2234 to reflect an existing policy against professionals using limitation-of-liability provisions, we would expect to see similar statutes among provisions governing general corporations and partnerships. The fact that such companion provisions do not exist supports rejecting Ocotillo's contention.

■ ¶ 13 In sum, we decide that A.R.S. § 10–2234 does not reflect a public policy prohibiting enforcement of limitation-of-liability provisions in all professional service contracts.

**B.**

■ ¶ 14 Ocotillo next contends that A.R.S. § 32–1159 (2002) reflects a public policy against enforcement of limitation-of-liability provisions in construction contracts and architect-engineer professional service contracts, like the Contract at issue in this case. Section 32–1159 provides in relevant part as follows:

> A. A covenant, clause or understanding in, collateral to or affecting a construction contract or architect-engineer professional service contract that purports to indemnify, to hold harmless or to defend the promisee [4] from or against liability for loss or damage resulting from the sole negligence of the promisee or the promisee's agent, employees or indemnitee is against the public policy of this state and is void.
>
> . . . .
>
> C. This section applies to all contracts entered into between private parties. . . . .

According to Ocotillo, the prohibition against permitting professionals like WLB from enforcing provisions designed to exculpate themselves from liability for their sole negligence necessarily prohibits limitation-of-liability provisions. Otherwise, Ocotillo contends, professionals subject to § 32–1159 could easily maneuver around the policy underlying this provision by limiting their liability rather than taking full responsibility for their negligence as the legislature intended. WLB responds that § 32–1159 is inapplicable as it only prohibits enforcement of exculpation provisions. Because limitation-of-liability provisions do not exculpate a negligent professional from liability, WLB contends neither § 32–1159, nor its underlying policy, prohibits enforcement of limitation-of-liability provisions in construction or architect-engineer professional service contracts.

¶ 15 Both Ocotillo and WLB cite cases from other jurisdictions to support their respective positions. Ocotillo relies substantially on the Alaska Supreme Court's decision in *City of Dillingham v. CH2M Hill Nw., Inc.*, 873 P.2d 1271, 1272–73 (Alaska 1994), which addressed the enforceability of a limitation-of-liability provision in a contract executed by a city and an engineering firm to effectuate the city's construction of a sewage treatment facility. The provision limited the engineering firm's liability for its "sole negligent acts, errors, or omissions" to the greater of $50,000 or the firm's total compensation under the contract. *Id.* After the city sued the firm for its performance under the contract, the trial court granted partial summary judgment to the firm, ruling that any damages ultimately awarded to the city would be limited as provided in the limitation-of-liability provision. *Id.* at 1273.

¶ 16 The Alaska Supreme Court reversed, holding that Alaska Statute ("AS") section 45.45.900 (West 1994), which prohibited the enforceability of indemnity clauses within construction contracts, also applied to prohibit limitation-of-liability provisions in such contracts.[5] *City of Dillingham*, 873 P.2d at

---

4. The parties implicitly agree that the term "promisee" refers to the beneficiary of the indemnity or hold harmless clause rather than the beneficiary of the work performed pursuant to the professional service contract. In light of the

statute's focus on a "covenant, clause or understanding," and the statute's purpose, *see infra* ¶ 20, we agree.

5. Alaska Statute § 45.45.900 provided, in relevant part, as follows:

1277–78. In reaching its conclusion, the court relied on the legislative history for the statute, which revealed that the legislature had considered but rejected a provision explicitly exempting limitation-of-liability provisions from AS § 45.45.900. *Id.* at 1276–77. The court reasoned that the absence of such an exemption in AS § 45.45.900 as ultimately enacted evidenced the legislature's intent to include such provisions within the reach of the statute. *Id.* Additionally, the court construed the word "indemnify" in AS § 45.45.900 to broadly mean "exempt," which, the court asserted, further supported a conclusion that the legislature intended to prohibit limitation-of-liability provisions. *Id.*

¶ 17 Approximately eight months after the decision in *City of Dillingham*, the Third Circuit Court of Appeals considered the same issue in *Valhal Corp. v. Sullivan Assoc., Inc.*, 44 F.3d 195 (3d Cir.1995), but reached the opposite conclusion. Not surprisingly, WLB urges us to adopt the *Valhal* court's approach in resolving this appeal. In *Valhal*, a real estate developer contracted with an architectural, planning, and engineering firm for a feasibility study regarding a high-rise building project. *Id.* at 198. Standard conditions attached to a proposal sent to the developer by the firm included a provision limiting the firm's liability for "professional negligent acts, errors or omissions," to $50,000 or the firm's fee under the contract. *Id.* After the developer later sued the firm for its performance under the contract, the

Pennsylvania district court granted the developer's motion to strike the provision as unenforceable under public policy reflected by Pennsylvania's anti-indemnity provision, 68 Pa. Stat. Ann. § 491 (West 1994).[6] *Valhal*, 44 F.3d at 199 & n. 2.

¶ 18 On appeal, the Third Circuit considered, among other issues, whether 68 Pa. Stat. Ann § 491 reflected a public policy in Pennsylvania against limitation-of-liability provisions in owner-architect contracts. *Id.* at 205. The court commenced its analysis by noting that § 491 did not directly apply as it governed only indemnification and hold-harmless clauses, which were distinct from the limitation-of-liability provision at issue in that case.[7] *Id.* The court further stated that Pennsylvania courts distinguish between exculpatory and limitation-of-liability provisions and that limitation-of-liability provisions not involving architects "are routinely enforced." *Id.* at 202–03, 205. According to the court, these factors "preclude an assumption that a statute expressing a prohibition against indemnity and hold harmless provisions announces a public policy against something as distinct and accepted as limitation of liability clauses. . . . [S]uch an assumption [would have] the practical effect of amending this statute." *Id.* at 205. Finally, the court distinguished contracts between licensed professionals owing fiduciary duties, such as lawyers and doctors, from contracts between owners and architects. *Id.* Although public policy prohibited the former category of con-

---

A provision, clause, covenant, or agreement contained in, collateral to, or affecting a construction contract that purports to indemnify the promisee against liability for damages for (1) death or bodily injury to persons, (2) injury to property, (3) design defects or (4) other loss, damage or expense arising under (1), (2), or (3) of this section from the sole negligence or willful misconduct of the promisee or the promisee's agents, servants or independent contractors who are directly responsible to the promisee, is against public policy and is void and unenforceable. . . .
*See also City of Dillingham*, 873 P.2d at 1273–74 (citing above statute).

6. Section 491 provided, in pertinent part, as follows:

Every covenant, agreement or understanding . . . in connection with any contract or agreement made and entered into by owners, con-

tractors, subcontractors or suppliers whereby an architect . . . or his agents . . . shall be indemnified or held harmless for damages . . . arising out of: (1) the preparation or approval by an architect . . . or his agents . . . of . . . opinions, reports, . . . or specifications, or (2) the giving of or the failure to give directions or instructions by the architect . . . or his agents . . . shall be void as against public policy and wholly unenforceable.
*See also Valhal*, 44 F.3d at 204 (citing above statute).

7. According to the *Valhal* court, an exculpatory clause immunizes a person from his or her own negligence, an indemnity clause holds that person harmless from such liability by requiring another to bear the damages awarded, and a limitation-of-liability clause places a cap on damages awarded against the negligent actor. 44 F.3d at 202.

tracts from utilizing limitation-of-liability provisions, such policy did not apply to the latter category of contracts. *Id.* Unlike the case with fiduciary relationships, which are given special protection, the court concluded that no reason existed to preclude owners and architects from allocating risks between themselves in a way that neither was relieved from liability for its own negligence. *Id.* at 205–06. For these reasons, the court held that the limitation-of-liability provision at issue was enforceable. *Id.* at 209.

¶ 19 In determining whether A.R.S. § 32–1159 reflects a public policy against enforcement of limitation-of-liability provisions in construction contracts or architect-engineer professional service contracts, we find the reasoning in *Valhal* more persuasive than that in *City of Dillingham* for several reasons. First, as Ocotillo acknowledges, by prohibiting provisions that purport "to indemnify, to hold harmless or to defend the promisee," § 32–1159 does not expressly prohibit the use of limitation-of-liability provisions in such contracts. Provisions that "indemnify" and "hold harmless" exonerate a promisee from liability, while provisions imposing an obligation to "defend" require the promisor to "deny, contest, or oppose" a claim alleged against the promisee. Black's Law Dictionary 429, 737, 772 (7th ed.1999); *see also State v. Korzep,* 165 Ariz. 490, 493, 799 P.2d 831, 834 (1990) (holding that unless legislature gives special meaning to a statutory word, court gives word ordinary meaning); *State v. Wise,* 137 Ariz. 468, 470 n. 3, 671 P.2d 909, 911 n. 3 (1983) (stating that in determining ordinary meaning of a word a court may refer to established and widely used dictionary). In contrast, a limitation-of-liability provision does not exonerate the promisee or require defense of a claim but instead caps the amount of liability. *Valhal,* 44 F.3d at 202; Allen Holt Gwyn, *Legislative and Judicial Responses to Limitation of Liability Provisions,* 16–OCT Constr. Law 61,

61 (1996). Thus, contrary to the *City of Dillingham* court's reasoning, we do not equate "exemption" from liability with a cap of damages for such liability. *See City of Dillingham,* 873 P.2d at 1277.

¶ 20 Second, unlike the legislative history underlying the decision in *City of Dillingham,* the legislative history for § 32–1159 does not reflect a public policy prohibiting enforcement of limitation-of-liability provisions in professional service contracts. Rather, the history reflects the legislature's intention to remedy a specific concern in the construction industry regarding indemnity provisions.[8] According to the senate fact sheet for H.B. 2358, which the legislature enacted as § 32–1159, the statute originated for the following reasons:

> The construction industry has expressed concern with broad form indemnification clauses which are often mandated by insurance companies. These clauses relieve most parties to a project of liability, and require contractors to purchase additional liability insurance coverage, thus resulting in increased project costs.

> Further, the construction industry believes that the statutory exclusion of indemnification clauses would prevent persons, who might otherwise be excused from liability, from lowering their standard of care concerning dangerous conditions in and around construction projects.

Thus, according to the senate fact sheet, the purpose of H.B. 2358 was to "[i]nvalidate[ ] most indemnity provisions in construction contracts and architect-engineer professional service contracts." Unlike the case in *City of Dillingham,* the legislative history for § 32–1159 does not reflect any consideration of limitation-of-liability provisions.

¶ 21 Third, absent an ascertainable public policy to the contrary, parties in Arizona are generally free to contract as they wish. *Smith v. Saxon,* 186 Ariz. 70, 73, 918

---

8. In 1981, twelve years prior to the enactment of § 32–1159, the legislature enacted A.R.S. § 34–226 (2000) as part of Arizona's Little Miller Act, A.R.S. §§ 34–221 to –227 (2000 & Supp.2007), which governs construction contracts concerning public buildings and improvements. Section 34–226(A) is virtually identical to § 32–1159(A).

Thus, the effect of enacting § 32–1159 was to treat all construction and architect-engineer contracts in the same manner as those involved in public projects. In 1996, the legislature repeated this provision in Arizona's procurement code. A.R.S. § 41–2586 (2004).

P.2d 1088, 1091 (App.1996). Moreover, limitation-of-liability provisions have been accepted in commercial contracts outside the construction industry. *See SRP v. Westinghouse,* 143 Ariz. at 385, 694 P.2d at 215; *Central Alarm,* 116 Ariz. at 78, 567 P.2d at 1207–08. Consequently, if the legislature had intended to restrict this privilege by voiding limitation-of-liability provisions in construction and architect-engineer contracts, we would expect it to have done so directly rather than by voiding indemnity provisions in such contracts. *Valhal,* 44 F.3d at 205. For these reasons, we reject Ocotillo's contention that the public policy underlying A.R.S. § 32–1159 prohibits limitation-of-liability provisions in construction and architect-engineer professional service contracts.

### C.

¶ 22 In summary, we hold that the public policy of Arizona does not broadly prohibit the enforceability of provisions limiting the liability of all professionals for their negligence in performing contractual duties. Additionally, the public policy of Arizona does not specifically prohibit enforceability of such provisions within construction and architect-engineer professional service contracts, like the Contract at issue in this appeal.[9]

### II. Jury question

¶ 23 Ocotillo next argues the trial court erred by entering partial summary judgment because Article 18, Section 5, of the Arizona Constitution requires that a jury decide the enforceability of limitation-of-liability provisions. That section provides as follows: "The defense of contributory negligence or of assumption of risk shall, in all cases whatsoever, be a question of fact and shall, at all times, be left to the jury." In *Phelps,* 210 Ariz. at 404–05, ¶¶ 2, 6–7, 111 P.3d at 1004–05, the supreme court recognized that a written release signed by a professional racecar driver, which exculpated a racetrack owner

from liability if the driver was injured in a race, constituted an express contractual assumption of risk. Consequently, the court held that Article 18, Section 5, requires a jury to decide the enforceability of the release even in the face of uncontested material facts. *Id.* at 405, 410, ¶¶ 5, 31, 111 P.3d at 1005, 1010. Ocotillo contends that the limitation-of-liability provision at issue in this case is likewise an express contractual assumption of risk, and a jury must therefore decide its enforceability.

¶ 24 WLB initially responds that Ocotillo has waived its argument pursuant to Article 18, Section 5, by raising it for the first time on appeal. Although generally we refrain from considering issues not raised to the trial court, we have discretion to consider constitutional issues raised for the first time on appeal. *Hawkins v. Allstate Ins. Co.,* 152 Ariz. 490, 503, 733 P.2d 1073, 1086 (1987). We exercise our discretion to consider the applicability of Article 18, Section 5, in this case for multiple reasons. The issue is a purely legal one and concerns a party's entitlement to partial summary judgment. WLB has not pointed to any additional evidence it would have presented had Ocotillo raised the issue to the trial court, and we do not discern any prejudice to WLB. Indeed, WLB has fully briefed the issue to this court. *See City of Tempe v. Fleming,* 168 Ariz. 454, 456, 815 P.2d 1, 3 (App.1991) (exercising discretion to review issue not raised to trial court as a purely legal issue raised in summary judgment proceeding, no prejudice to appellee, and matter one of statewide interest).

¶ 25 Additionally, the trial court entered partial summary judgment for WLB prior to the supreme court's decision in *Phelps* and therefore applied traditional contract-law principles rather than considering whether Article 18, Section 5, requires a jury to determine the enforceability of a limitation-of-liability provision even in the face of uncontested material facts. Although WLB correctly asserts that Ocotillo could have alerted the

---

9. We do not express any opinion regarding the enforceability of such provisions within other types of professional service contracts, such as those involving lawyers and doctors, which involve fiduciary relationships. Likewise, we do

not express any opinion regarding the enforceability of limitation-of-liability provisions purporting to cap damages for intentional or reckless acts.

trial court to *Phelps* in 2006 when WLB moved for entry of judgment pursuant to ARCP 54(b), we do not consider this omission sufficient cause to perpetuate an analytical framework our supreme court potentially abrogated in *Phelps*. For these reasons, we reject WLB's waiver argument and turn to the merits of Ocotillo's contention.

¶ 26 The determinative issue before us is whether the limitation-of-liability provision in the Contract constitutes an express contractual assumption of risk. If so, the decision in *Phelps* would require us to conclude that Article 18, Section 5, mandates a jury trial to determine the enforceability of the provision even in the face of uncontested facts. If not, we would apply traditional contract principles to decide whether disputed issues of material fact exist concerning the enforceability of the provision.

¶ 27 Relying on *Phelps*, WLB contends that only a provision that entirely exculpates a party from tort liability constitutes an assumption of risk subject to Article 18, Section 5, which is not the case with the limitation-of-liability provision at issue. We disagree. Although the release in *Phelps* entirely exculpated the racetrack owner from liability for its negligence, 210 Ariz. at 404, ¶ 2, 111 P.3d at 1004, we do not read *Phelps* as limiting its holding to exculpation provisions. In rejecting the notion that summary judgment is sometimes appropriately entered to enforce contractual waivers of liability, the court reasoned in relevant part as follows:

> Other appellate cases have also suggested that courts may grant summary judgment to defendants when they assert an assumption of risk defense. *See ...* [*SRP v. Westinghouse,* 143 Ariz. at 384, 694 P.2d at 214] (suggesting that summary judgment was inappropriate because there was a genuine fact question concerning whether the limitation of liability was actually bargained for). None of those cases, however, addressed the applicability of Article 18, Section 5.

*Phelps*, 210 Ariz. at 410 n. 5, ¶ 32, 111 P.3d at 1010 n. 5. In concluding that its opinion would *not* subject a "new cadre of cases" for jury consideration, the *Phelps* court cited *SRP v. Westinghouse* as an example of an

Arizona opinion that had found "factual questions about the scope of an express contractual assumption of risk or whether a plaintiff understood its terms." *Id.* at 413, ¶ 41, 111 P.3d at 1013. The court's description of the limitation-of-liability provision at issue in *SRP v. Westinghouse* as an "express contractual assumption of risk" defeats WLB's assertion that the *Phelps* holding is limited to contractual provisions that entirely exculpate a defendant from tort liability. *See also id.* at 418 n. 14, ¶ 66, 111 P.3d at 1018 n. 14 (McGregor, Vice C.J., dissenting) (recognizing that majority's opinion requires issue of enforceability of limitation-of-liability provisions like the one at issue in *SRP v. Westinghouse* to be submitted to a jury); Restatement (Third) of Torts: Apportionment of Liability § 2 (2000), cmt. a & c (stating that "[c]ontractual limitation on liability are often called 'express assumption of risk'" and can either absolve liability entirely or "may limit liability to a specific amount").

¶ 28 In summary, we hold that a contractual provision limiting the amount of damages for a party's negligence is a form of assumption of risk. As such, pursuant to Article 18, Section 5, of the Arizona Constitution and the supreme court's decision in *Phelps*, the enforceability of such provisions must be resolved by a jury. For this reason, the trial court erred by entering partial summary judgment in favor of WLB on this issue, and we therefore reverse. On remand, a jury must decide whether to enforce the limitation-of-liability provision set forth in the Contract and to what extent. The court may instruct the jury on the enforceability of contracts, but it must make clear that the ultimate decision about the enforceability of the limitation-of-liability provision is for the jury. *Phelps*, 210 Ariz. at 410, ¶ 31, 111 P.3d at 1010. In light of our holding, we need not decide whether the trial court correctly applied contract principles to decide whether issues of material fact exist regarding the enforceability of the provision. Similarly, we do not decide whether the trial court correctly applied the provision to cap any damages a jury may award Ocotillo; a jury must resolve that issue.

**CONCLUSION**

¶ 29 For the foregoing reasons, we decide that Arizona's public policy does not prohibit enforcement of contractual limitation-of-liability provisions in construction contracts or architect-engineer professional service contracts. The enforceability of such provisions, however, must always be decided by a jury pursuant to Article 18, Section 5, of the Arizona Constitution. Consequently, the trial court erred by entering partial summary judgment concerning the enforceability of the provision at issue in this case. We therefore reverse and remand for a jury trial to decide the issue.

CONCURRING: JOHN C. GEMMILL, Chief Judge, and PATRICIA A. OROZCO, Judge.

