SUPREME COURT OF ARIZONA
En Banc

| | | |
|---|---|---|
| 1800 OCOTILLO, LLC, an Arizona limited liability company, | ) ) ) | Arizona Supreme Court No. CV-08-0057-PR |
| Plaintiff/Appellant, | ) ) ) | Court of Appeals Division One No. 1 CA-CV 07-0037 |
| v. | ) ) | |
| THE WLB GROUP, INC., an Arizona corporation, | ) ) ) | Maricopa County Superior Court No. CV2000-021738 |
| Defendant/Appellee. | ) ) ) | |
| | ) | **O P I N I O N** |
| _____ | ) | |

Appeal from the Superior Court in Maricopa County
The Honorable Peter B. Swann, Judge

_____

Opinion of the Court of Appeals, Division One
217 Ariz. 465, 176 P.3d 33 (App. 2008)

**VACATED AND REMANDED**

_____

TIFFANY & BOSCO, P.A.                                           Phoenix
      By    Dow Glenn Ostlund
            Tracy S. Morehouse
            Kevin P. Nelson
Attorneys for 1800 Ocotillo, LLC

BONNETT, FAIRBOURN, FRIEDMAN & BALINT, P.C.                     Phoenix
      By    Jerry C. Bonnett
            Meredith L. Vivona
Attorneys for the WLB Group, Inc.

FOLK & ASSOCIATES, P.C.                                         Phoenix
      By    P. Douglas Folk
Attorneys for Amici Curiae American Council of
Engineering Companies of Arizona, ASFE, AIA Arizona,
and Arizona Professional Land Surveyors

_____

**B A L E S**, Justice

¶ 1    This case involves a contract providing that a surveyor's liability to its client for negligently performing work may not exceed the surveyor's fees.  We hold that the liability-limitation clause is neither contrary to public policy nor subject to Arizona's constitutional requirement that the defense of assumption of risk always be submitted to a jury.

## FACTS AND PROCEDURAL HISTORY

¶ 2    The WLB Group, Inc. ("WLB"), a surveying and engineering firm, entered a professional services contract with 1800 Ocotillo, LLC ("Ocotillo"), which planned to build townhouses near a canal.  One of WLB's duties was to prepare a survey identifying boundary lines and rights-of-way.  After WLB completed the survey, the canal operator claimed an interest in a right-of-way that was not accurately reflected in WLB's survey.  This discrepancy caused the City of Phoenix to deny Ocotillo certain building permits.

¶ 3    Ocotillo sued alleging that WLB had negligently prepared the survey and thereby caused Ocotillo to incur increased costs from construction delays and additional engineering services and designs.  WLB responded by arguing that any liability on its part was limited by a "Standard Condition" in the parties' contract.  This provision states:

Client agrees that the liability of WLB, its agents

2

and employees, in connection with services hereunder to the Client and to all persons having contractual relationships with them, resulting from any negligent acts, errors and/or omissions of WLB, its agents and/or employees is limited to the total fees actually paid by the Client to WLB for services rendered by WLB hereunder.

¶ 4        Ocotillo argued that this provision is unenforceable as contrary to public policy.  Rejecting this argument, the trial court granted partial summary judgment limiting WLB's potential liability to the $14,242.00 in fees WLB had received.  After the court entered judgment under Rule 54(b) of the Arizona Rules of Civil Procedure, Ocotillo appealed.

¶ 5        The court of appeals agreed that the liability-limitation provision does not violate public policy.  *1800 Ocotillo, LLC v. WLB Group, Inc.*, 217 Ariz. 465, 474 ¶ 22, 176 P.3d 33, 43 (App. 2008).  Addressing an argument that Ocotillo first raised on appeal, the court further held that the provision is subject to the requirement in Article 18, Section 5 of the Arizona Constitution that the "defense of assumption of risk" shall be submitted to the jury "in all cases whatsoever." *Id.* at 475 ¶ 28, 176 P.3d at 43.  Accordingly, the court of appeals ruled that "[o]n remand, a jury must decide whether to enforce the limitation-of-liability provision set forth in the Contract and to what extent." *Id.*

¶ 6        WLB petitioned for review of the assumption of risk issue and Ocotillo cross-petitioned for review of the public

3

policy issue.  We granted both petitions because they concern important issues of statewide interest.  We have jurisdiction under Article 6, Section 5(3) of the Arizona Constitution and Arizona Revised Statutes ("A.R.S.") § 12-120.24 (2003).

## I.

¶ 7    Contract provisions are unenforceable if they violate legislation or other identifiable public policy.  *See Webb v. Gittlen*, 217 Ariz. 363, 366 ¶ 13, 369 ¶ 35, 174 P.3d 275, 278, 281 (2008) (holding that public policy does not bar clients' assignment of negligence claims against their insurance agents); Restatement (Second) of Contracts § 178 (1981).  "Legislation" as used here includes not only statutes but also constitutions, ordinances, and applicable regulations.  Restatement (Second) of Contracts § 178 cmt. a.  In determining whether a provision is unenforceable, courts balance the interest in enforcing the provision against the public policy interest that opposes enforcement.  *Id.* cmt. b.  Analysis of the weight of the public policy interest generally focuses on the extent to which enforcement of the term would be injurious to the public welfare.  *Id.*

¶ 8    Courts, however, are hesitant to declare contractual provisions invalid on public policy grounds.  *See* 15 Grace McLane Giesel, *Corbin on Contracts* § 79.3, at 18 (rev. ed. 2003) ("[C]ourts generally have acted cautiously in declaring a

4

contract contrary to public policy."). Our law generally presumes, especially in commercial contexts, that private parties are best able to determine if particular contractual terms serve their interests. *See Salt River Project Agric. Improvement & Power Dist. v. Westinghouse Elec. Corp.* ("*SRP*"), 143 Ariz. 368, 375, 383, 694 P.2d 198, 205, 213 (1984). Society also broadly benefits from the prospect that bargains struck between competent parties will be enforced. *See* Restatement (Second) of Contracts § 178 cmt. b ("[T]he law[ has a] traditional interest in protecting the expectations of the parties."). Accordingly, absent legislation specifying that a contractual term is unenforceable, courts should rely on public policy to displace the private ordering of relationships only when the term is contrary to an otherwise identifiable public policy that clearly outweighs any interests in the term's enforcement. *Id.* § 178.

**A.**

¶ **9** In arguing that the liability limitation is unenforceable, Ocotillo cites an anti-indemnity statute governing architect-engineer professional service contracts and other statutes regulating certain forms of business organizations. None of these statutes, however, declares that a liability-limitation provision is unenforceable.

¶ **10** The anti-indemnity statute provides:

5

A covenant, clause or understanding in, collateral to or affecting a construction contract or architect-engineer professional service contract that purports to indemnify, to hold harmless or to defend the promisee from or against liability for loss or damage resulting from the sole negligence of the promisee or the promisee's agents, employees or indemnitee is against the public policy of this state and is void.

A.R.S. § 32-1159 (2008); *see also* A.R.S. § 34-226 (2000) (similar provision regarding contracts for construction or improvement of public buildings).

¶ 11    By its terms, A.R.S. § 32-1159 applies only to agreements to "indemnify," "hold harmless," or "defend" the promisee for its sole negligence.  Agreements to indemnify or hold harmless are essentially the same and require one party "[t]o absolve (another party) from any responsibility for damage or other liability arising from the transaction."  Black's Law Dictionary 749, 783-84 (8th ed. 2004).  Provisions that impose a duty to "defend" require a party to "deny, contest, or oppose (an allegation or claim)."  *Id.* at 450.  In short, A.R.S. § 32-1159 concerns attempts to shift *all* liability for one's own negligence to another party.  *See Valhal Corp. v. Sullivan Assocs.*, 44 F.3d 195, 202 (3d Cir. 1995) ("[A]n indemnity clause holds the indemnitee harmless from liability by requiring the indemnitor to bear the cost of *any* damages for which the indemnitee is held liable." (emphasis added)).

¶ 12    The policy underlying the anti-indemnification statute

6

clarifies why the distinction between indemnity and liability limitation is important. Anti-indemnification statutes are primarily intended to prevent parties from eliminating their incentive to exercise due care. *See id.* at 203-07. Because an indemnity provision eliminates all liability for damages, it also eliminates much of the incentive to exercise due care.

¶ **13**    The provision in the WLB/Ocotillo contract does not completely insulate WLB from liability, as would an indemnity or hold harmless provision, nor does it require Ocotillo to defend WLB. The provision merely limits liability.

¶ **14**    Although it is possible that a limitation of liability provision could cap the potential recovery at a dollar amount so low as to effectively eliminate the incentive to take precautions, this is not the case here. Under the Ocotillo contract, WLB remains liable for the fees it earns. The fees undoubtedly were WLB's main reason for undertaking the work. Thus, WLB retains a substantial interest in exercising due care because it stands to lose the very thing that induced it to enter into the contract in the first place. *See Marbro, Inc. v. Borough of Tinton Falls*, 688 A.2d 159, 162-63 (N.J. Super. Ct. Law Div. 1996) (holding that a cap on liability equal to total fees earned "provided adequate incentive to perform"). Because the clause does not eliminate WLB's liability, but instead caps it by an amount that substantially preserves WLB's interest in

7

exercising due care, A.R.S. § 32-1159 does not apply.

**B.**

¶ 15     Ocotillo also cites statutes regulating various forms of business organizations.  Under A.R.S. § 10-2234 (2004), a shareholder of a professional corporation "is personally and fully liable and accountable for any negligent or wrongful act or misconduct" the shareholder commits while rendering services on behalf of the professional corporation.  Similarly, A.R.S. § 29-846 (1998) states that "[e]ach member, manager or employee performing professional services" on behalf of a limited liability company "shall remain personally liable for any results of the negligent or wrongful acts, omissions or misconduct committed by him."  Finally, A.R.S. § 29-1025(A) (1998) generally provides that a partnership "is liable for loss or injury caused to a person . . . as a result of a [partner's] wrongful act or omission, or other actionable conduct" in the course of the partnership's business or with its authority.

¶ 16     Ocotillo argues that these statues evidence the legislature's intent to preclude professionals from limiting their liability through contract.  But these statutes do not address contractual limitations of liability.  Sections 10-2234 and 29-846 establish that professionals who organize under them do not enjoy the same protections against personal liability that generally results from incorporation or formation of a

8

limited liability company.  Section 29-1025(A) simply recognizes that a partnership is liable for the acts of the partners.  WLB is not a professional corporation, a professional limited liability company, or a partnership.  It is a traditional corporation, to which none of these statutes apply.

## c.

¶ **17**     We also decline to hold that liability-limitation clauses are generally unenforceable as contrary to a judicially identified public policy.  Such clauses may desirably allow the parties to allocate as between themselves the risks of damages in excess of the agreed-upon cap, which could preserve incentives for one party to take due care while assigning the risk of greater damages to another party that might be better able to mitigate or insure against them.  *See SRP*, 143 Ariz. at 383, 694 P.2d at 213.  To the extent that such clauses may undesirably reflect the result of coercion or otherwise improper bargaining, other contractual doctrines, such as those specifying conditions for effective consent, serve to protect against their enforcement in particular cases.  Moreover, we have previously held that clauses waiving certain tort liability entirely, rather than merely capping prospective damages for negligence, may be enforceable.  *See id.* at 385, 694 P.2d at 215 (discussing conditions for enforceability of clause waiving certain tort claims).

¶ **18** Ocotillo relies on two cases from other jurisdictions. First, Ocotillo argues that we should follow *City of Dillingham v. CH2M Hill Northwest Inc.*, 873 P.2d 1271 (Alaska 1994), which held a liability limitation invalid as against the public policy of Alaska. That decision was largely premised upon the Alaska legislature's express rejection of a proposal to exempt liability-limitation provisions when it enacted its anti-indemnification statute. *Id.* at 1276-78. There is no similar legislative history for A.R.S. § 32-1159. Rather than presume that our legislature implicitly intended to proscribe liability-limitation provisions, we instead believe the legislature specified those contractual terms it meant to declare unenforceable.

¶ **19** Second, Ocotillo relies on *Lanier at McEver, L.P. v. Planners & Engineers Collaborative, Inc.*, 663 S.E.2d 240 (Ga. 2008). The contractual provision at issue there provided that a construction developer agreed

> to limit the liability of [an engineering firm] and its sub-consultants to [the construction developer] and to all construction contractors and subcontractors on the project *or any third parties* . . . so that the total aggregate liability of [the engineering firm] and its subconsultants . . . shall not exceed [the] total fee for services rendered.

*Id.* at 241 (emphasis added). The court construed this clause as an indemnification, which the court then invalidated under Georgia's anti-indemnification statute. *Id.* at 242-43. The

10

court concluded that the provision would completely immunize the engineering firm from liability to third parties after the firm paid out an amount equal to its fee. *Id.* at 243-44. Although a third party could still sue the engineering firm, the firm would be entitled to reimbursement from the construction developer for any losses. *Id.*

¶ 20     *Lanier* is not helpful to Ocotillo. The *Lanier* court itself distinguished the Ocotillo/WLB provision because it is "devoid of any reference to liability for third-party claims brought by the general public." *Id.* at 243 n.4 (citing *1800 Ocotillo, LLC v. WLB Group, Inc.*, 217 Ariz. 465, 176 P.3d 33 (App. 2008)). Thus, the *Lanier* court concluded that the clause here is not an indemnity clause, as do we. *Lanier* also distinguished, and apparently approved, the liability-limiting clause in *Valhal*, which is virtually identical to the provision at issue here. *Id.* at 243 & n.3.

¶ 21     In sum, we do not believe that liability-limitation clauses like the one at issue here are unenforceable as contrary to an identifiable public policy that clearly outweighs any interests in their enforcement.

## II.

¶ 22     We next address whether the liability-limitation clause constitutes an "assumption of risk" subject to Article 18, Section 5 of the Arizona Constitution. This section

11

provides: "The defense of contributory negligence or of assumption of risk shall, in all cases whatsoever, be a question of fact and shall, at all times, be left to the jury."

¶ 23    Because the constitution does not define the phrase "assumption of risk," we must first consider what the phrase generally meant at the time of our constitutional convention and the purposes animating the delegates when they included Article 18, Section 5 in the proposed constitution.  At common law, the doctrine of assumption of risk served as an absolute bar to a plaintiff's recovery.    Delegates to the convention were particularly concerned that courts had used the "unholy trinity" of assumption of risk, contributory negligence, and the fellow-servant rule to bar recovery by injured employees against their employers.    Noel Fidel, *Preeminently a Political Institution: The Right of Arizona Juries to Nullify the Law of Contributory Negligence*, 23 Ariz. St. L.J. 1, 10-12 (1991).

¶ 24    After considering and rejecting a proposal to simply abolish the defense of assumption of risk, the delegates instead decided to mitigate its harsh effects by providing in Article 18, Section 5 that the defense will be both a question of fact and reserved to the jury in "all cases whatsoever."  *See Schwab v. Matley*, 164 Ariz. 421, 424, 793 P.2d 1088, 1091 (1990); *Hall v. A.N.R. Freight Sys. Inc.*, 149 Ariz. 130, 133, 717 P.2d 434, 437 (1986).    The delegates also reserved to the jury the

12

determination of the defense of contributory negligence and both abolished the fellow-servant rule and prohibited certain agreements that "released or discharged" employers from liability. Ariz. Const. art. 18, §§ 3-5.

¶ 25    This background suggests that Article 18, Section 5 was intended to address "assumption of risk" in the sense of a defense that effectively relieved a defendant of any duty of care by completely barring recovery by the injured party. For example, in *Schwab*, 164 Ariz. at 424, 793 P.2d at 1091, we noted that

> [a]ssumption of the risk as a defense . . . *always* "rest[ed] upon the idea that the defendant [was] relieved of any duty toward the plaintiff." The very basis of the doctrine was that the plaintiff had expressly or impliedly consented to the defendant's negligent conduct, "the legal result [being] that the defendant is simply relieved of the duty which would otherwise exist."

*Id.* (emphasis added)(citations omitted)(quoting W. Page Keeton, et al., *Prosser and Keeton on the Law of Torts* § 65, at 451, § 68, at 481 (5th ed. 1984)).

¶ 26    The phrase "assumption of risk" has admittedly evolved in the nearly one hundred years since the adoption of our constitution. *Cf. Phelps v. Firebird Raceway*, 210 Ariz. 403, 406 ¶ 14, 111 P.3d 1003, 1006 (2005) (observing that the doctrine of assumption of risk has been used by courts in several different senses). Although Article 18, Section 5

13

provides that a jury shall determine whether this defense applies in particular cases, the constitution also allows the legislature to further limit its application by, for example, providing that it would be subsumed under comparative fault principles that reduce rather than deny recovery. *See Gunnell v. Ariz. Pub. Serv. Co.*, 202 Ariz. 388, 394 ¶¶ 22-23, 46 P.3d 399, 406 (2002). Similarly, some commentators have described "assumption of risk" more broadly to include not only the common law's complete defense to recovery but also liability-limitation clauses. *See, e.g.*, Restatement (Third) of Torts: Apportionment of Liability § 2 cmt. a (2000); Restatement (Second) of Torts § 496(B) cmt. h (1965); Keeton, et al., *supra*, § 68, at 482-83.

¶ **27**     We most recently construed Article 18, Section 5 in *Phelps*, which held that the constitutional provision applies to express assumptions of risk. In that case, a racecar driver agreed with a racetrack to "voluntarily accept the risks" and to "RELEASE[], WAIVE[], DISCHARGE[] AND COVENANT[] NOT TO SUE [the racetrack] . . . FOR ALL LOSS OR DAMAGE" he sustained "WHETHER CAUSED BY THE NEGLIGENCE OF THE [racetrack] OR OTHERWISE." *Phelps*, 210 Ariz. at 404 ¶ 2, 111 P.3d at 1004. In holding that this provision (which was titled "assumption of risk" in the contract) was subject to Article 18, Section 5, we observed that such agreements have long been classified as "assumption of risk" and that the doctrine includes different forms of the

14

defense without regard to whether the agreement was express or implied. *Id.* at 405-06 ¶¶ 7-11, 14, 111 P.3d at 1005-06.

¶ **28** *Phelps* did not, however, address the issue presented here: whether a liability-limitation clause is an assumption of risk defense subject to Article 18, Section 5. Consistent with the background to this constitutional provision, *Phelps* focused on assumption of risk in the sense of a defense that would have completely barred any recovery – there an exculpatory clause relieving the racetrack of any liability. To be sure, *Phelps* referred in passing to the contractual provisions in *SRP* as involving "assumption of risk." *See id.* at 413 ¶ 41, 111 P.3d at 1013. But the provisions in *SRP* involved both a complete waiver of certain claims and a liability limitation. *See SRP*, 143 Ariz. at 373, 694 P.2d at 203. Moreover, *SRP* itself distinguished "disclaimers" of liability that relieve a party of any duty of care - which have the same effect as the common law doctrine of assumption of risk - from agreements that limit tort remedies. *Id.* at 385, 694 P.2d at 215. *SRP* did not discuss, much less decide, whether a liability-limitation clause is subject to Article 18, Section 5. Thus, neither *SRP* nor *Phelps* resolves the question before us.

¶ **29** There are good reasons to interpret "assumption of risk" as used in Article 18, Section 5 to refer only to defenses that effectively relieve the defendant of any duty. It was the

15

harsh consequence of such a defense that caused the framers to reserve its determination to the jury. This concern is not implicated by agreements that reasonably limit rather than eliminate liability. Moreover, the benefits of such agreements in allowing parties to prospectively allocate potential losses in excess of the cap would be largely lost if their enforceability turned in every case on after-the-fact jury determinations. *See Gunnell*, 202 Ariz. at 394 ¶ 23, 46 P.3d at 406 (noting that Article 18, Section 5 precludes summary judgment or directed verdict on issue of assumption of risk).

¶ **30**     We conclude that liability-limitation provisions generally are not a form of "assumption of risk" within the meaning of Article 18, Section 5. When such provisions do not effectively relieve a party from a duty to exercise due care, but instead merely place a ceiling on recoverable damages, they do not operate like the common law defense of assumption of risk. Construing Article 18, Section 5 to include such provisions would not comport with either the common meaning of the phrase "assumption of risk" at the time of the constitutional convention or with the purpose animating the framers.

¶ **31**     We note that the WLB/Ocotillo liability-limitation provision does not purport to relieve WLB of all liability nor does it have that effect. It does not abrogate WLB's duty

16

toward Ocotillo, but instead limits the recoverable damages if the duty is breached.   This clause is not an "assumption of risk" within the meaning of Article 18, Section 5.

## III.

¶ 32     Ocotillo finally argues that even if liability-limitation clauses generally are not contrary to public policy or subject to Article 18, Section 5, the clause in its contract should not be enforced.   In this regard, Ocotillo contends that the liability limitation was not freely and knowingly negotiated between the parties as required by *SRP* or it was contrary to Ocotillo's reasonable expectations under the doctrine established in *Darner Motor Sales, Inc. v. Universal Underwriters Insurance Co.*, 140 Ariz. 383, 391-92, 682 P.2d 388, 396-97 (1984).   Ocotillo maintains that, at the least, material facts are disputed regarding the clause's enforceability.   WLB counters by arguing that the *SRP* standard for enforcing a waiver clause should not apply or was met and that *Darner* is inapplicable.   Rather than address these arguments in the first instance, we leave them to the court of appeals to consider on remand.   *Cf. First Am. Title Ins. Co. v. Action Acquisitions, LLC*, __ Ariz. __, __, ¶ 32, 187 P.3d 1107, 1113-14 (2008) (declining to decide application of reasonable expectations doctrine in case involving business entities).

17

**IV.**

¶ **33**     We conclude that the liability-limitation clause in the WLB/Ocotillo contract is neither contrary to public policy nor subject to Article 18, Section 5 of the Arizona Constitution.  Accordingly, we vacate the opinion of the court of appeals and remand this case so that court may consider any other properly preserved arguments by the parties concerning the appropriateness of the trial court's entry of partial summary judgment enforcing the clause.

_____
                        W. Scott Bales, Justice

CONCURRING:

_____
Ruth V. McGregor, Chief Justice

_____
Rebecca White Berch, Vice Chief Justice

_____
Michael D. Ryan, Justice

_____
Andrew D. Hurwitz, Justice

18