IN THE

# SUPREME COURT OF THE STATE OF ARIZONA

---

**TINA ZAMBRANO,**
*Plaintiff/Appellant,*


*v.*


**M & RC II LLC, ET AL.,**
*Defendants/Appellees.*

---

No. CV-21-0205-PR
**Filed September 28, 2022**

---

Appeal from the Superior Court in Maricopa County
The Honorable Danielle J. Viola, Judge
No. CV2017-008174
**REVERSED AND REMANDED**

---

Opinion of the Court of Appeals, Division One
252 Ariz. 10 (App. 2021)
**VACATED**

---

COUNSEL:

Darrien Shuquem (argued), Vial Fotheringham, LLP, Mesa, Attorneys for Tina Zambrano

James E. Holland, Jr. (argued), Michael Vincent, Stinson LLP, Phoenix, Attorneys for M & RC II LLC, et al.

Thomas L. Hudson, Joshua D. Bendor, Osborn Maledon, P.A., Phoenix, Attorneys for Amici Curiae Diamante Condominium Association and Kasdan Turner Thomson Booth LLP

Rosary A. Hernandez, Kenneth Januszewski, Katelyn E. Towe, Burch & Cracchiolo, P.A., Phoenix, Attorneys for Amici Curiae Home Builders

Association of Central Arizona and Southern Arizona Home Builders Association

Jeremy R. Alberts, Ryan S. Saldanha, Weinberg, Wheeler, Hudgins, Gunn & Dial, LLC, Las Vegas, NV, Attorneys for Amicus Curiae Home Buyers Warranty Corporation

––––––––––––

VICE CHIEF JUSTICE TIMMER authored the Opinion of the Court, in which CHIEF JUSTICE BRUTINEL and JUSTICES LOPEZ, BEENE, and MONTGOMERY joined. JUSTICE KING, joined by JUSTICE BOLICK, dissented.

––––––––––––

VICE CHIEF JUSTICE TIMMER, Opinion of the Court:

**¶1** This case involves a clash of two public policies recognized by the common law. On the one hand, parties are generally free to contract on whatever terms they choose. *See 1800 Ocotillo, LLC v. WLB Grp., Inc.*, 219 Ariz. 200, 202 ¶ 8 (2008). Thus, unless legislation precludes enforcement of a contract term, our courts will uphold it unless "the term is contrary to an otherwise identifiable public policy that clearly outweighs any interests in the term's enforcement." *Id.*

**¶2** On the other hand, Arizona implies a warranty of workmanship and habitability in every contract entered into between a builder-vendor and a homebuyer. *See Richards v. Powercraft Homes, Inc.*, 139 Ariz. 242, 244 (1984). This warranty protects the homebuyer and successive purchasers from financial responsibility for latent defects in the home that the buyer could not have reasonably discovered at the time of purchase and holds the builder accountable for the home's faulty construction. *Id.* at 245.

**¶3** Whether Arizona should continue to imply a warranty of workmanship and habitability into all contracts between builder-vendors and homebuyers is not before us. Rather, the issue here is whether a builder-vendor and a homebuyer may agree to disclaim and waive the implied warranty if they replace it with an express warranty. We hold public policy prohibits enforcement of the disclaimer and waiver.

2

**BACKGROUND**

¶4        In 2013, Tina Zambrano entered into a preprinted purchase agreement with M & RC II, LLC, to buy a home that M & RC II's affiliate, Scott Homes Development Company, would build in a new subdivision in Surprise, Arizona.   (We refer to M & RC II and Scott Homes Development Company collectively as "Scott Homes").   Relevant here, paragraph fifteen of the agreement states:

SELLER'S LIMITED WARRANTY.

(a) At Closing, Seller shall issue a "Home Builder's Limited Warranty" to Buyer, a sample of which has been provided to Buyer prior to the execution of this Contract. The Home "Builder's [sic.] Warranty is the only warranty applicable to the purchase of the Property.

. . . .

THE    HOME    BUILDER'S    LIMITED    WARRANTY REFERENCED  ABOVE  IS  THE  ONLY  WARRANTY APPLICABLE TO THE PURCHASE OF THE PROPERTY. ALL OTHER EXPRESS OR IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, HABITABILITY AND WORKMANSHIP ARE HEREBY DISCLAIMED BY SELLER AND ITS AFFILIATES AND WAIVED BY BUYER, ANY IMPLIED WARRANTY THAT MAY EXIST DEPITE [sic] THE ABOVE DISCLAIMER IS HEREBY LIMITED TO A ONE (1) YEAR PERIOD.

Zambrano initialed the first paragraph and another, which confirmed she had read and understood the agreement.

¶5        Scott Homes built the home and, fulfilling its promise, issued Zambrano a forty-page, preprinted "Builder's Limited Warranty," which is administered by Professional Warranty Services Corporation ("PWC"). PWC sells the warranty to homebuilders, claiming the warranty "provide[s] 'layers of protection to you as a builder'" and permits builders to "manage [their] risk." *Arnold v. Standard Pac. of Ariz. Inc.*, No. CV-16-00452-PHX-DGC, 2016 WL 4259762, at *4 (D. Ariz. Aug. 12, 2016). Significantly, the PWC warranty does not generally warrant the

3

workmanship and habitability of the home. Instead, it arranges construction elements into coverage groups; warrants each group, respectively, for one year, two years, or three to ten years against damages from variances in materials or workmanship from defined standards of performance; and establishes responsibilities for the builder and the homebuyer. For example, the warranty here provides that during the first year of ownership, Scott Homes will fill excessively settled areas of ground around the home's foundation that prevent sufficient drainage, and the homebuyer will remove and replace any affected landscaping. As another example, the warranty provides that during the first year of ownership, Scott Homes will repair any floors having more than a one-quarter-inch ridge or depression within thirty inches of the joists. Like the purchase agreement, the PWC warranty disclaims all implied warranties.

¶6            In 2017, Zambrano sued Scott Homes for breach of the implied warranty of workmanship and habitability. She alleged several design and construction defects, including improper grading and soil movement mitigation, separation of windows from cracking stucco, separation of baseboards from the tile and walls, and nail pops in the ceiling. A claim under the PWC warranty to correct these defects was either time barred or outside its coverage. Scott Homes ultimately moved for summary judgment, arguing Zambrano had waived the implied warranty per the purchase agreement. The trial court agreed and entered judgment for Scott Homes.

¶7            The court of appeals reversed. *Zambrano v. M & RC II LLC*, 252 Ariz. 10, 11 ¶ 1 (App. 2021). It reasoned that "the public policy supporting the implied warranty clearly outweighs the freedom-of-contract interest in the waiver's enforcement." *Id.* at 13 ¶ 16.

¶8            We accepted review of Scott Homes' petition for review because whether and to what extent the implied warranty of workmanship and habitability can be disclaimed and waived or replaced by an express warranty is a recurring issue of statewide importance.

## DISCUSSION

### I.   Standard of Review

¶9            Summary judgment is appropriate when "no genuine dispute as to any material fact [exists] and the moving party is entitled to judgment

as a matter of law." Ariz. R. Civ. P. 56(a). "We review de novo a grant of summary judgment, viewing the evidence and reasonable inferences in the light most favorable to the party opposing the motion." *Andrews v. Blake*, 205 Ariz. 236, 240 ¶ 12 (2003). We likewise review a contract's meaning de novo. *Id.*

## II. Voiding a Contract Term as Against Public Policy

**¶10** The freedom to contract has long been considered a "paramount public policy" under our common law that courts do not lightly infringe.[1] *Consumers Int'l., Inc. v. Sysco Corp.*, 191 Ariz. 32, 34 (App. 1997) (quoting *Wood Motor Co. v. Nebel*, 238 S.W.2d 181, 185 (Tex. 1951)); *accord CSA 13-101 Loop, LLC v. Loop 101, LLC*, 236 Ariz. 410, 411 ¶ 6 (2014) ("Our law values the private ordering of commercial relationships and seeks to protect parties' bargained-for expectations."). Thus, courts will not refuse to enforce a contract merely because one party made a bad deal, even when the terms are harsh. *See Goodman v. Newzona Inv. Co.*, 101 Ariz. 470, 473–74 (1966) (enforcing refusal of seller to transfer ownership of property to buyer despite partial payment); *S.H. Kress & Co. v. Evans*, 21 Ariz. 442, 449 (1920) (refusing to enforce oral profit-sharing agreement not reflected in a written contract).

**¶11** But courts will refuse to enforce a contract term if legislation prohibits the term or when an identifiable public policy clearly outweighs enforcement. *1800 Ocotillo*, 219 Ariz. at 202 ¶¶ 7–8; *CSA 13-101 Loop*,

---

[1] The Supreme Court once held that "liberty" under the Due Process Clause protected "freedom of contract," *Adkins v. Child.'s Hosp. of D.C.*, 261 U.S. 525, 545 (1923); *see Lochner v. New York*, 198 U.S. 45, 57 (1905), but ultimately retreated from that position, *W. Coast Hotel Co. v. Parrish*, 300 U.S. 379, 391–92, 400 (1937) (overruling *Adkins* and, effectively, *Lochner* and other cases); *see also Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2262–64 (2022) (recognizing reversal of these *Lochner*-era holdings). Courts now recognize the freedom to contract as protected by the common law. *Flagstaff Affordable Hous. Ltd. P'ship v. Design All., Inc.*, 223 Ariz. 320, 323 ¶ 14 (2010) (describing contract law as "seek[ing] to preserve freedom of contract and to promote the free flow of commerce"); Michael Pillow, *Liberty Over Death: Seeking Due Process Dimensions for Freedom of Contract*, 8 Fla. A & M U. L. Rev. 39, 40–41 (2012) ("Freedom of contract derives from philosophical perspectives that underpin the common law.").

236 Ariz. at 411 ¶ 6.   Because the law generally presumes parties are best situated to decide whether contractual terms are beneficial, especially in commercial settings, courts are hesitant to declare terms unenforceable on public policy grounds.   *1800 Ocotillo*, 219 Ariz. at 202 ¶ 8; *see* 15 Timothy Murray, *Corbin on Contracts* § 79.4, at 15 (rev. ed. 2020) ("In rare cases, a public policy other than the freedom of contract overrides such freedom."). To do so, courts balance the interests in enforcing the terms against the public policy interest opposing it.   *See 1800 Ocotillo*, 219 Ariz. at 202 ¶ 7. "[T]he weight of the public policy interest generally focuses on the extent to which enforcement of the term would be injurious to the public welfare." *Id.* (citing Restatement (Second) of Contracts § 178 cmt. b (Am. L. Inst. 1981)).   We identify public policy by examining our constitution, legislation, and judicial decisions.   *CSA 13-101 Loop*, 236 Ariz. at 412 ¶ 8; *1800 Ocotillo*, 219 Ariz. at 202 ¶ 7; *Wagenseller v. Scottsdale Memorial Hosp.*, 147 Ariz. 370, 378 (1985), *superseded by statute on other grounds, as recognized in Powell v. Washburn*, 211 Ariz. 553, 560 ¶ 29 (2006).

**¶12**      Consistent with these principles, this Court has refused to enforce contract terms that were unconscionable, illegal, or otherwise against public policy.   *See, e.g.*, *Dobson Bay Club II DD, LLC v. La Sonrisa de Siena, LLC*, 242 Ariz. 108, 115 ¶¶ 37–38 (2017) (voiding a contractual late fee as an unenforceable penalty provision); *CSA 13-101 Loop*, 236 Ariz. at 411 ¶ 1 (holding that parties to a promissory note and deed of trust could not prospectively waive a judgment debtor's statutory right to have the fair market value of the burdened property credited against the amount owed on the note); *Wagenseller*, 147 Ariz. at 381 ("Firing for bad cause—one against public policy articulated by constitutional, statutory, or decisional law—is not a right inherent in the at-will contract, or in any other contract, even if expressly provided."); *Darner Motor Sales, Inc. v. Universal Underwriters Ins.*, 140 Ariz. 383, 390–91 (1984) (stating courts will not enforce a standardized insurance contract term when the insurer has reason to believe that the insured would not have agreed to the contract if he had known about the term).

**¶13**      With these principles in mind, we identify the public policy underlying the implied warranty of workmanship and habitability and then determine whether that policy clearly outweighs enforcement of the parties' disclaimer and waiver of the implied warranty when an express warranty otherwise exists.   *See 1800 Ocotillo*, 219 Ariz. at 202 ¶ 7.

### III. Enforcing the Disclaimer and Waiver Provision Here

A. <u>Identifying the public policy underlying the implied warranty</u>

**¶14** Commencing in 1979, Arizona eliminated application of caveat emptor—or "buyer beware"—to the purchase of newly built homes. *Columbia W. Corp. v. Vela*, 122 Ariz. 28, 32 (App. 1979) (describing the rule as "an anachronism patently out of harmony with modern home buying practices" (quoting *Humber v. Morton*, 426 S.W.2d 554, 562 (Tex. 1968))); *see also Dorman v. Swift and Co.*, 162 Ariz. 228, 231 (1989) (stating that the common law doctrine of caveat emptor presumes the buyer has fully inspected the premises before conveyance). Instead, we impute the implied warranty of workmanship and habitability into all contracts between builder-vendors and homebuyers as a matter of common law. *See Sirrah Enters., LLC v. Wunderlich*, 242 Ariz. 542, 544 ¶ 8 (2017); *Sullivan v. Pulte Home Corp.*, 232 Ariz. 344, 346 ¶ 12 (2013). Under this implied warranty, the builder-vendor guarantees it built the home in a workmanlike manner and that it is habitable. *Sirrah Enters.*, 242 Ariz. at 544 ¶ 8. The warranty is limited to latent defects that are undiscoverable by a reasonable pre-purchase inspection and serves "to protect innocent purchasers and hold builders accountable for their work." *Richards*, 139 Ariz. at 245 (quoting *Moxley v. Laramie Builders, Inc.*, 600 P.2d 733, 736 (Wyo. 1979)).

**¶15** The implied warranty "arises from construction of the home" itself. *Sirrah Enters.*, 242 Ariz. at 544 ¶ 8 (quoting *Lofts at Fillmore Condo. Ass'n v. Reliance Com. Constr., Inc.*, 218 Ariz. 574, 577 ¶ 13 (2008)). Consequently, although the warranty is an imputed term of the original purchase agreement, it applies to non-builder-vendors and is enforceable by subsequent purchasers, despite a lack of contractual privity with the builder. *Id.* at 545 ¶¶ 9–12 (subsequent purchaser); *Lofts*, 218 Ariz. at 575 ¶ 1 (non-builder-vendor). A lawsuit filed to enforce the warranty is subject to the six-year statute of limitations applicable to contract actions, A.R.S. § 12-548(A); *Woodward v. Chirco Constr. Co.*, 141 Ariz. 514, 516 (1984), but cannot be filed later than eight years after construction is completed per our statute of repose, A.R.S. § 12-552(F).

**¶16** Given the warranty's origins and application, it is not a mere "gap filler" supplied by the court when an otherwise enforceable contract

lacks an essential term, as Scott Homes and the dissent here assert. *See* Restatement § 204. Our cases are clear that policy considerations gave birth to the implied warranty, not a need to fill in an overlooked "gap" in contracting. *See supra* ¶¶ 14–15. Further, because an express warranty is not essential to determining a builder-vendor and homebuyer's rights and duties under a purchase agreement, its omission does not leave a "gap" to fill. *See* Restatement § 204. And if an express warranty is included in a purchase agreement, it may coexist with the implied warranty; the warranties are not mutually exclusive. *See Columbia W. Corp.*, 122 Ariz. at 29, 33 (recognizing an implied warranty despite the existence of an express warranty and the lack of any gap); *Desert Mountain Props. Ltd. P'ship v. Liberty Mut. Fire Ins. Co.*, 225 Ariz. 194, 207 ¶ 46 (App. 2010) (same).

¶17 Although the legislature has not explicitly codified the terms of the implied warranty of workmanship and habitability, it has explicitly approved it (1) by accommodating causes of action based on the warranty in the Purchaser Dwelling Act, A.R.S. § 12-1362(E) (providing that "the bifurcation process prescribed in [the Act] does not alter the seller's liability under the seller's implied warranty to the purchaser"); (2) by including it within a statute of repose for contract actions against home builders and vendors, § 12-552(F) (stating that the eight-year limitation period applies to "any action based on implied warranty arising out of the contract or the construction, including implied warranties of habitability, fitness or workmanship"); and (3) by providing a one-year repose period for homebuyers to sue for damages caused by latent defects discovered in the eighth year after purchase, § 12-552(E). *See CSA 13-101 Loop*, 236 Ariz. at 412 ¶ 8 ("Even when not expressly prohibited [by statute], contract terms may be invalidated 'if the legislature makes an adequate declaration of public policy which is inconsistent with [them].'" (second alteration in original) (quoting *Shadis v. Beal*, 685 F.2d 824, 833–34 (3d Cir. 1982))).

¶18 The legislature has also recognized the importance of holding builders in general to sufficient workmanship standards by requiring the registrar of contractors to establish "minimum standards for good and workmanlike construction." A.R.S. § 32-1104(A)(5). Fulfilling this mandate, the registrar requires builders to "perform all work in a professional and workmanlike manner" and "in accordance with any applicable building codes and professional industry standards." Ariz. Admin. Code R4-9-108(A)–(B). To satisfy this standard, "a contractor shall use such skills, prudence, and diligence in performing and completing tasks undertaken that the completed work meets the standards of a similarly

licensed contractor possessing ordinary skill and capacity." R4-9-108(B). By establishing workmanship standards for licensed contractors, which benefit those contractors' customers and the public at large, Rule 4-9-108 aligns with the purposes of the implied warranty of workmanship and habitability.

¶19        In sum, the public policy underlying the implied warranty of workmanship and habitability is twofold: (1) protecting buyers of newly built homes and successive owners against latent construction defects that were not reasonably discoverable when the home was initially sold and (2) holding builders accountable for their work. *Richards*, 139 Ariz. at 244–45.

B.        <u>Weighing the public policy underlying the implied warranty against enforcement of the disclaimer and waiver provision</u>

¶20        While acknowledging the presumption that private parties are best able to decide whether particular contract terms serve their interests, and respecting that society broadly benefits from relying on the enforcement of bargains struck between competent parties, we nevertheless decide that the circumstances here present the rare case where public policy clearly outweighs enforcing a contract term. *See 1800 Ocotillo*, 219 Ariz. at 202 ¶ 8.

1.        *The interest in enforcing the disclaimer and waiver provision*

¶21        We start by noting a diminished interest in enforcing a disclaimer and waiver of the implied warranty because homebuyers possess vastly unequal bargaining power, expertise, and knowledge as compared with the builder-vendor. *Id.* ¶ 7 ("Analysis of the weight of the public policy interest generally focuses on the extent to which enforcement of the term would be injurious to the public welfare."). Modern homebuilding frequently occurs in large-scale developments, leaving the buyer to either purchase the home under terms directed by the builder-vendor or forego the purchase altogether. *See Richards*, 139 Ariz. at 245. Indeed, Zambrano signed Scott Homes' form purchase agreement and accepted the PWC warranty with no variation to the preprinted terms in either document, without representation, and without any negotiation about warranties, suggesting she was in a take-it-or-leave-it situation. *See Darner Motor Sales*, 140 Ariz. at 390–91 (observing that a term in a

standardized contract is "an illusory 'bargain' . . . when that 'bargain' was never really made and would, if applied, defeat the true agreement which was supposedly contained in the [contract]").

**¶22** A homebuyer must also rely heavily on the builder-vendor's knowledge of construction quality, as builders are "skilled in the profession, . . . modern construction is complex and regulated by many governmental codes, and . . . homebuyers are generally not skilled or knowledgeable in construction, plumbing, or electrical requirements and practices." *Richards*, 139 Ariz. at 245; *see Columbia W. Corp.*, 122 Ariz. at 32 ("The ordinary home buyer is not in a position, by skill or training, to discover defects lurking in the plumbing, the electrical wiring, the structure itself, all of which is usually covered up and not open for inspection." (quoting *Tavares v. Horstman*, 542 P.2d 1275, 1279 (Wyo. 1975))). And unlike those who purchase older homes, a person who buys a newly built home "has no opportunity to observe how the [home] has withstood the passage of time." *Columbia W. Corp.*, 122 Ariz. at 32 (quoting *Pollard v. Saxe & Yolles Dev. Co.*, 525 P.2d 88, 91 (Cal. 1974)).

**¶23** This inequality in bargaining power, expertise, and knowledge distinguishes the new-home-buying scenario from ones in which the parties are on similar footing and are thus better able to decide what contract terms serve their individual interests. *See 1800 Ocotillo*, 219 Ariz. at 204 ¶ 17 (declining to invalidate a liability-limitation clause entered by a real estate developer and a surveying firm on public policy grounds as such clauses desirably permitted sophisticated parties to allocate risks). The implied warranty was created in recognition of this disparity, *see Richards*, 139 Ariz. at 245, and undoubtedly reflects the homebuyers' reasonable expectations that a newly constructed home would be properly designed and built, *see Columbia W. Corp.*, 122 Ariz. at 33.

> 2. *The counterweight of the public policy supporting imposition of the implied warranty*

**¶24** As previously explained, in assigning weight to the public policy underlying the implied warranty we generally focus on the extent to which enforcement of the disclaimer and waiver provision would injure the public welfare. *1800 Ocotillo*, 219 Ariz. at 202 ¶ 7.

**¶25** The implied warranty serves to protect homebuyers and the public at large in multiple ways. First, warranting that a home was built

using minimum standards of good workmanship conforms to a homebuyer's reasonable expectations. *See Columbia W. Corp.*, 122 Ariz. at 33. Second, the warranty discourages "the unscrupulous, fly-by-night operator and purveyor of shoddy work," who might otherwise blight our communities. *Id.* at 32 (quoting *Humber*, 426 S.W.2d at 562). Third, it protects not only the original buyer but also subsequent purchasers. *See Richards*, 139 Ariz. at 245 ("The effect of latent defects will be just as catastrophic on a subsequent owner as on an original buyer and the builder will be just as unable to justify improper or substandard work."). Fourth, the warranty shields a purchase that "is usually the most important and expensive purchase of a lifetime," thus minimizing the risk of catastrophic financial losses for all homebuyers who purchase a home within eight years of construction. *Columbia W. Corp.*, 122 Ariz. at 33 (quoting W. Durrell Nielsen II, Comment, *Caveat Emptor in Sales of Real Property Time for a Reappraisal*, 10 Ariz. L. Rev. 484, 491 (1968)); *see Richards*, 139 Ariz. at 245.

**¶26** Enforcing the disclaimer and waiver here would grievously injure homebuyers and the public welfare as doing so would likely spell the end for the implied warranty and eliminate the above-described protections. Builders would almost certainly include a disclaimer and waiver in every purchase agreement with the new homebuyer lacking any realistic ability to negotiate deletion of the term. And, as has already occurred in Arizona and reflected in the public record, the builder would surely record the disclaimer and waiver to provide notice to subsequent homebuyers and prevent them from enforcing the implied warranty, as the law currently permits, even though they had no say in waiving a warranty that arose from the construction itself. *See Sirrah Enters.*, 242 Ariz. at 544–45 ¶¶ 8–12.

**¶27** Effectively eliminating the implied warranty, in turn, would gut a homebuyer's ability to hold a builder responsible for latent defects, increasing the likelihood that homes would be left unrepaired, to the detriment of homebuyers, their neighbors, and the public generally. The Purchaser Dwelling Act permits a homebuyer to sue a builder-vendor for defects involving the builder's "violation of construction codes," its "use of defective materials," and its "failure to adhere to generally accepted workmanship standards in the community," after giving the builder a chance to repair or replace those defects. *See* A.R.S. § 12-1361(4), (7); § 12-1362(A)–(B). But the Act does not itself provide a legal cause of action for such lawsuits. And without the ability to enforce the implied warranty

11

of workmanship and habitability, there is no legal cause of action to remedy these defects.

¶28            A homebuyer cannot pursue a negligence claim against the builder to recover economic damages caused by latent defects, absent personal injury or damage to other property, because Arizona, unlike other states, does not permit such claims.   *See Sullivan*, 232 Ariz. at 345–46 ¶¶ 8–9 (concluding the economic loss doctrine bars the original homebuyer from asserting a negligence claim to recover repair costs); *Sullivan v. Pulte Home Corp.*, 237 Ariz. 547, 548 ¶¶ 1–3 (App. 2015) (holding that a subsequent homebuyer cannot maintain a negligence action against a builder to recover repair costs because the builder does not owe a duty to that homebuyer); *see also Sewell v. Gregory*, 371 S.E.2d 82, 84–85 (W. Va. 1988) (noting most state courts which have considered the issue permit a subsequent homebuyer to sue a builder for negligent construction). Causes of action based on fraud, misrepresentation, and material omissions remain available, just as they did before Arizona recognized the implied warranty of workmanship and habitability.   *See, e.g.*, *Echols v. Beauty Built Homes, Inc.*, 132 Ariz. 498, 499 (1982) (addressing fraud in sale of home). But these claims depend on purposeful wrongdoing by the builder, presumably an uncommon occurrence, and would not protect the homebuyer from the builder's unintentionally poor workmanship.   *See id.* at 500 (setting out the elements of fraud).

¶29            An unhappy homebuyer may file a complaint against the builder's license with the registrar of contractors and potentially recover money from the residential contractors' recovery fund.   *See* A.R.S. §§ 32-1131 to -1140.   But this remedy is no substitute for enforcing the implied warranty of workmanship and habitability against the builder-vendor.   Unlike a claim for breach of the implied warranty, the homebuyer's recovery is capped at $30,000, does not reimburse consequential damages, and attorney fees are not generally recoverable. *See Sirrah Enters.*, 242 Ariz. at 547 ¶¶ 20–22; *Flagstaff Affordable Hous. Ltd.*, 223 Ariz. at 325–26 ¶ 27; A.R.S. § 32-1132.01(B), (D)–(E).   Also, the registrar proceedings must commence within two years after the builder's act, *see* A.R.S. § 32-1133(A), which forecloses claims involving later-discovered latent defects.   *See, e.g.*, *Woodward*, 141 Ariz. at 515 (addressing cracks in home, ceiling bowing, and floor warping that started three years after purchase); § 12-552(E) (permitting suit on latent defects discovered eight years after purchase if brought within the following year).

**¶30** Scott Homes argues the PWC warranty adequately satisfies the public interest in protecting homebuyers from shoddy workmanship. It further asserts the express warranty is superior to the implied warranty by explicitly defining the parties' rights and obligations in advance, thereby avoiding costly litigation about what is "habitable," and by extending the warranty up to ten years for some defects. We disagree.

**¶31** The PWC warranty does not protect the same interests as those protected by the implied warranty. While the implied warranty protects against a builder's lack of conformity with generally accepted community standards for workmanship and habitability,[2] the PWC warranty protects against nonconformity with tolerances it establishes for certain construction components within the warranty periods, most of which fall into the one-year period. For example, regardless of workmanship standards, the PWC warranty provides that Scott Homes will repair a separation of stoops, steps, or garage floors from the home if the width exceeds one inch and if that separation occurs within the first year of ownership. A violation of the PWC warranty tolerances might not violate the implied warranty and vice versa. *Cf. Nastri*, 142 Ariz. at 444 (noting the implied warranty does not protect against every imperfection). Although related, the interests protected by each warranty—good workmanship (implied) versus conformance with specific standards (express)—are distinct. *Cf. Columbia W. Corp.*, 122 Ariz. at 29, 32 (recognizing the need for the implied warranty even though the builder had expressly warranted that the home would be built in substantial conformance with plans and specifications).

---

[2] Contrary to Scott Homes' assertion, the implied warranty of workmanship and habitability is not so ill-defined that parties are left scratching their heads about the meaning of "habitability" absent an express warranty. The implied warranty is a single warranty. *See Nastri v. Wood Bros. Homes*, 142 Ariz. 439, 444 (App. 1984). It is breached if the builder did not construct the home in a workmanlike manner. *See Dillig v. Fisher*, 142 Ariz. 47, 50 (App. 1984); *see also Nastri*, 142 Ariz. at 444 (stating the implied warranty is satisfied if the home is "reasonably suited for its intended use" (quoting *Petersen v. Hubschman Constr. Co.*, 389 N.E.2d 1154, 1158 (Ill. 1979))). There is no requirement to show that the home is unlivable. *See Dillig*, 142 Ariz. at 50.

**¶32** Comparing the two warranties further demonstrates that the PWC warranty is an insufficient substitute for the implied warranty and is certainly not superior from the homebuyer's or the public's perspective. Unlike the implied warranty, the PWC warranty does not apply to latent design defects that may later result in damages. *See Woodward*, 141 Ariz. at 516. Most components are warranted for only one year after purchase, even if latent defects manifest after one year. *Cf. id.* at 515 (allowing a cause of action for defect found over three years after closing on the home purchase); § 12-552(E) (allowing a cause of action for defects discovered within eight years of substantial completion). Additionally, the PWC warranty caps the amount Scott Homes must spend to repair deficiencies (the cap amount is reflected in a form that is not part of our record). Finally, rather than warranting the entire home from defects, the PWC warranty applies only to select construction components and leaves others uncovered. For example, defects in roof or floor sheathing due to faulty materials or substandard installation are explicitly not warrantied, unless the buyer holds a Federal Housing Administration or United States Department of Veterans Affairs mortgage.

**¶33** We also disagree with Scott Homes' remaining arguments, most of which are intended to add weight to enforcement of the disclaimer and waiver provision. Prohibiting waiver of the implied warranty will not itself prevent enforcement of arbitration provisions set forth in the PWC warranty because the warranty has a severability clause. *See Hamblen v. Hatch*, 242 Ariz. 483, 491 ¶ 34 (2017) (noting that public policy favors arbitration). And disallowing disclaimer and waiver of the implied warranty will not disincentivize builders from competing to offer the "best" express warranty. A builder can still offer an attractive express warranty that exceeds the minimum standards of workmanship and habitability established by the implied warranty.

**¶34** Scott Homes also asserts that the implied warranty serves a similar purpose to the implied warranties of merchantability and fitness for a particular purpose, which apply to consumer goods. It argues that because those warranties can be waived, *see* A.R.S. § 47-2316(B), we should similarly conclude that the implied warranty here can be disclaimed and waived. But an implied home warranty is unique in protecting against financial catastrophe for homebuyers and community blight. *See supra* ¶ 25. Unlike with most defective consumer goods, poorly built homes are not easily discarded or replaced, and their impact can linger for decades.

**¶35** Finally, although we considered leaving open the possibility that a sophisticated homebuyer in some settings could negotiate to waive the implied warranty, we reject that idea. It would be next to impossible for courts to decide whether a homebuyer was sophisticated "enough." Even sophisticated homebuyers need the protection offered by the implied warranty because they cannot spot hidden, latent defects at the time of purchase; and subsequent homebuyers should not be penalized simply because the original owner was sophisticated and chose to waive the implied warranty. Thus, unless the legislature enacts a statute permitting waiver of the implied warranty, our courts will not permit it.

**¶36** In sum, we conclude the public policy underlying the implied warranty of workmanship and habitability clearly outweighs enforcement of the disclaimer and waiver of that warranty in the purchase agreement and the PWC warranty here. *See 1800 Ocotillo*, 219 Ariz. at 202 ¶¶ 7–8; *CSA 13-101 Loop*, 236 Ariz. at 411 ¶ 6. Because the PWC warranty has a severability clause, the other provisions in that warranty are unaffected by this decision.

**¶37** Our court of appeals has reached conclusions similar to our decision today, *see Buchanan v. Scottsdale Env't Constr. & Dev. Co.*, 163 Ariz. 285, 286–87 (App. 1989) (concluding that the policies giving rise to the implied warranty also void any attempt by the builder to disclaim the warranty against the original owner); *see also Nastri*, 142 Ariz. at 442–43 (having the same effect as applied to a subsequent homebuyer), as have courts in other jurisdictions, *see, e.g.*, *Trs. of Cambridge Point Condo. Tr. v. Cambridge Point, LLC*, 88 N.E. 3d 1142, 1151 (Mass. 2018) ("[T]o permit the disclaimer of a warranty protecting a purchaser from the consequences of latent defects would defeat the very purpose of the warranty." (quoting *Albrecht v. Clifford*, 767 N.E.2d 42, 47 (Mass. 2002))); *Davencourt at Pilgrims Landing Homeowners Ass'n v. Davencourt at Pilgrims Landing, LC*, 221 P.3d 234, 252–53 ¶ 58 (Utah 2009) (to same effect). Although we recognize that other courts have reached different conclusions, we find those cases either distinguishable or simply wrong. *See, e.g.*, *Tusch Enters. v. Coffin*, 740 P.2d 1022, 1030–31 (Idaho 1987) (permitting disclaimer of the implied warranty outside boilerplate clauses if builder shows a knowing waiver); *Crowder v. Vandendeale*, 564 S.W.2d 879, 881 (Mo. 1978) (to same effect).

C. The dissent

**¶38** Our dissenting colleagues spill considerable ink expressing a contrary view. Most of their arguments track Scott Homes' arguments, which we have already addressed and rejected. A few additional points warrant mention or emphasis.

**¶39** First, the dissent bases all its arguments on the false premise that the parties here simply "modified" the implied warranty, otherwise leaving its protections intact. *See infra* ¶ 52. But the agreement and the PWC warranty plainly provide that the implied warranty is "waived" and "disclaimed," not modified. *Supra* ¶¶ 4–5. And as explained, the PWC warranty and the implied warranty protect different interests. *Supra* ¶ 31. The dissent's mischaracterization of the waiver and disclaimer provision as a "modification" of the implied warranty leads it to mistakenly conclude that the express warranty similarly serves to protect unwary buyers from suffering the consequences of latent defects, the implied warranty is merely a "gap-filler" rendered unnecessary by an express warranty, and the implied warranty therefore "should not be held paramount." *See infra* ¶ 57.

**¶40** Second, although the dissent claims to embrace the analytical paradigm this Court established in *1800 Ocotillo* to determine the enforceability of a contract provision, *see infra* ¶ 58, it wholly fails to apply it. Our colleagues do not identify a different public policy underlying the implied warranty than we do or weigh that policy against enforcement of the waiver and disclaimer provision. For example, the dissent fails to discuss the ramifications of permitting builder-vendors to insert waiver provisions in standard form contracts or the ability of buyers—whatever their sophistication level—to understand they are agreeing to purchase a new home with the risk of latent defects. Nor does the dissent identify attributes of express warranties that are "good enough" to further the same policies underlying the implied warranty or the characteristics of parties sufficiently "sophisticated" to protect themselves from the risk of latent defects.

**¶41** Instead, the dissent confuses matters by ignoring the policies underlying the implied warranty, failing to weigh them against the waiver provision, and pointing out needlessly that this Court has never before

established a public policy prohibiting such waivers.[3] *See infra* ¶ 58. By the dissent's flawed logic, because we have not previously conducted an *1800 Ocotillo* analysis to find that the policies underlying the implied warranty clearly outweigh enforcement of a contractual waiver provision, we are wrong to do so today. *See id.* Illogic aside, the dissent's analysis sidesteps *1800 Ocotillo*.

¶42 Third, the dissent cries foul on us for "focus[ing] on policy matters that are better—and, as a matter of separation of powers, more appropriately—left for the legislature to address." *See infra* ¶ 63. This criticism is unpersuasive and confusing.

¶43 Arizona is not a code state; we are a common law state. *See* A.R.S. § 1-201 (adopting the common law and directing courts to follow it unless inconsistent with the state or federal constitution or the laws of this state). Who declares the common law by focusing on public policy? We do, with appropriate restraint. *See Cal-Am Props. Inc. v. Edais Eng'g Inc.*, 253 Ariz. 78, 83 ¶ 17 (2022) (noting "'we exercise great restraint in declaring public policy' in the absence of legislative guidance" (quoting *Quiroz v. ALCOA, Inc.*, 243 Ariz. 560, 566 ¶ 19 (2018))); *Ontiveros v. Borak*, 136 Ariz. 500, 504 (1983) (stating that the common law is "judge-made and judge-applied" and changes as public policy changes). The common law has its place in our democracy, and we establish and apply it appropriately and with fitting restraint.

¶44 Since 1979, our courts have continuously applied the implied warranty as part of the common law. *See supra* ¶ 14. The legislature has explicitly approved causes of action based on the warranty by enacting laws governing their assertion. *See supra* ¶ 17. Indeed, explanatory documents supporting the bill enacted to amend the Purchaser Dwelling Act in 2019 reflected that a purchaser of a home may file a lawsuit against a builder-vendor for any construction defect after following the Act's procedures. *See* Ariz. State H.R. Summary for S.B. 1271, 54th Leg., 1st Reg. Sess. (Mar. 18, 2019); Ariz. State Senate Fact Sheet for S.B. 1271, 54th Leg., 1st Reg. Sess. (Feb. 19, 2019). The House of Representatives summary also cited an implied warranty case as authority that the buyer may only file suit against the party in privity. *See* Ariz. State H.R. Summary for S.B. 1271 (citing *Yanni v. Tucker Plumbing, Inc.*, 233 Ariz. 364, 367–68 (App. 2013)).

---

[3] The dissent ignores the two court of appeals cases decided more than thirty years ago that prohibited such waivers. *See supra* ¶ 37.

As previously explained, *see supra* ¶¶ 26–28, if the dissent's position prevails, the implied warranty would likely disappear, and without it buyers would have no cause of action to assert, making statutory references to the implied warranty superfluous. *See* § 12-552(E), (F); § 12-1362(E).

**¶45** We are also confused by our colleagues' criticism because, ironically, they focus on the public policy underlying the common law freedom to contract to urge their position. *See infra* ¶¶ 55, 60. Also, it seems to us that despite its protest to the contrary, *see infra* ¶ 62, the dissent's analysis would require a court to enforce a waiver and disclaimer provision even absent an express warranty, *see infra* ¶ 60 (relying on cases with holdings to that effect), leaving the homeowner with no warranty at all and changing our existing public policy that favors such provisions. And the dissent's assertion that the implied warranty can only be waived when an express warranty exists is itself a declaration of policy. *See infra* ¶ 62. Just like with the proverbial goose and gander, the criticism our dissenting colleagues throws our way applies equally to them.

**¶46** Fourth, the dissent gives short shrift to subsequent homebuyers, who would lose the protection offered by the implied warranty if the original purchaser could waive it. *See infra* ¶ 68. Again, by not weighing the *1800 Ocotillo* factors, the dissent kicks subsequent homebuyers to the curb by saying the impact on those buyers—and necessarily the public as a whole—"should be left for another day." *See infra* ¶ 68. But *this* is the day, and the dissent neatly avoids the uncomfortable reality that if builder-vendors are permitted to waive and disclaim the warranty, the warranty will vanish. *See supra* ¶ 26.

**¶47** Contrary to the dissent's assertion, we do not declare any new public policy today. *See infra* ¶ 65. Instead, we preserve the public policies that created the implied warranty more than forty years ago, which our legislature has approved and accommodated, and our courts have routinely enforced.

**¶48** We respect and take seriously parties' freedom of contract, and act with appropriate restraint when asked to prohibit enforcement of a term. But we also will not ignore our obligation to acquiesce to such requests when appropriate after conducting the *1800 Ocotillo* inquiry. This case presents one of the rare occasions we find a public policy paramount to the freedom of contract. Any relief for builder-vendors from our holding lies squarely with the legislature.

18

### IV. Attorney Fees

**¶49** Zambrano seeks an award of attorney fees incurred on appeal, but she failed to state the basis for the request as required by our rules of procedure. *See* ARCAP 21(a)(2) (requiring a party to "specifically state the statute, rule, decisional law, contract, or other authority for an award of attorneys' fees"). We therefore decline the request. As the prevailing party, we award Zambrano her costs. *See* A.R.S. § 12-341.

## CONCLUSION

**¶50** For the foregoing reasons, we reverse the summary judgment and remand this matter to the trial court. Although we agree with the court of appeals' holding, we vacate its opinion to replace its reasoning with our own.

KING, J., joined by BOLICK, J., Dissenting

**¶51**        In this case, a builder-vendor and a homebuyer, who is a licensed real estate broker, entered into a written contract agreeing to disclaim the judicially-created implied warranty of workmanship and habitability and enter into an express warranty instead.   The majority believes this "presents one of the rare occasions" where "public policy [is] paramount to the freedom of contract."   *Supra* ¶ 48.   We disagree.

**¶52**        Since the court of appeals created the implied warranty of workmanship and habitability in *Columbia Western Corp. v. Vela*, 122 Ariz. 28 (App. 1979), this Court has only applied the implied warranty in cases where the builder-vendor and homebuyer *did not agree to modify the implied warranty with an express warranty.*   *See, e.g., Sirrah Enters., LLC v. Wunderlich*, 242 Ariz. 542 (2017); *Lofts at Fillmore Condo. Ass'n v. Reliance Com. Constr., Inc.*, 218 Ariz. 574 (2008); *Richards v. Powercraft Homes, Inc.*, 139 Ariz. 242 (1984).   We reject the majority's bright-line rule today that Arizona's public policy prohibits two competent parties, in all instances, from modifying the implied warranty with specific warranty terms of their own choosing — even when they knowingly, voluntarily, and intelligently do so. We respectfully dissent.

**¶53**        At the outset, the majority acknowledges the implied warranty of workmanship and habitability is a court-made doctrine.   The majority then concludes the implied warranty can *never* — regardless of the circumstances or sophistication of the parties — be waived and replaced with an express warranty.   *Supra* ¶ 35 ("[A]lthough we considered leaving open the possibility that a sophisticated homebuyer in some settings could negotiate to waive the implied warranty, we reject that idea.").   This categorical constraint states a highly unusual exception in the law.

**¶54**        Generally speaking, parties are free to waive any number of rights, even constitutional rights such as the right to appeal, *Hinton v. Hotchkiss*, 65 Ariz. 110*,* 113–14 (1946), the right to counsel, *State v. Cornell*, 179 Ariz. 314, 322–23 (1994), the right to a jury trial, *State v. Butrick*, 113 Ariz. 563, 565–66 (1976), and the right to be present during criminal proceedings, *State v. Dann*, 205 Ariz. 557, 572 ¶ 54 (2003).   We are generally free to waive implied warranties and protections in other contexts.   *See, e.g.*, A.R.S. § 47-2316(B) (explaining how "to exclude or modify the implied warranty

of merchantability" and how "to exclude or modify any implied warranty of fitness"). We are free to waive indemnification. *See INA Ins. Co. of N. Am. v. Valley Forge Ins. Co.*, 150 Ariz. 248, 252 (App. 1986) ("When there is an express indemnity contract, the extent of the duty to indemnify must be determined from the contract, and not by reliance on implied indemnity principles." (internal citations omitted)). We are even free to waive parental rights. *See* A.R.S. § 8-106(A). And, as a matter of freedom of contract, we may waive another's duty to perform under a contract provision. *See Mohave Cnty. v. Mohave-Kingman Ests., Inc.*, 120 Ariz. 417, 421 (1978). Today's ruling is a sharp departure from the ordinary rule that parties may waive their rights.

¶55        Arizona's public policy favoring freedom of contract was established long before the court of appeals adopted the implied warranty in *Columbia Western Corp.* For over 100 years, this Court has affirmed Arizona's public policy that parties have the right to make decisions regarding their own affairs, property, and services, consistent with their priorities and values. Indeed, in 1914, this Court explained,

> We have always understood the law to be that persons under no legal disability, as a general rule, have power to do as they wish with their own. They may enter into contracts; they may give away their substance; they may spend it for mere baubles; they may exchange it for high and riotous living; it may go to satisfy vanity or pride or ambition; and the courts are helpless to say nay or to control their freedom of action in those respects. Courts are not instituted to control and supervise the private dealings of persons compos mentis who are upon an equal footing and labor under no restraint of person, property, or mind, such as fraud, duress, coercion, or extortion. Freedom of contract and freedom in the use and disposition of one's own are no less sacred than freedom of speech.

*Merrill v. Gordon*, 15 Ariz. 521, 531 (1914); *see also Warren v. Mosher*, 31 Ariz. 33, 38 (1926) ("A man may do as he will with his own, and if he chooses to give or contract it away, so long as it does not interfere with the rights of others, the contract will stand."); *Com. Standard Ins. Co. v. Cleveland*, 86 Ariz. 288, 293 (1959) ("[P]arties have a legal right to make such contracts as they desire to make, provided only that the contract shall not be for an illegal purpose or against public policy. A party cannot complain of the

harshness of the terms of the contract."); *Goodman v. Newzona Inv. Co.*, 101 Ariz. 470, 472 (1966) ("It is not within the province or power of the court to alter, revise, modify, extend, rewrite or remake an agreement. Its duty is confined to the construction or interpretation of the one which the parties have made for themselves."); *1800 Ocotillo, LLC v. WLB Grp., Inc.*, 219 Ariz. 200, 202 ¶ 8 (2008) ("Our law generally presumes . . . that private parties are best able to determine if particular contractual terms serve their interests. Society also broadly benefits from the prospect that bargains struck between competent parties will be enforced." (internal citation omitted)); *Flagstaff Affordable Hous. Ltd. v. Design All., Inc.*, 223 Ariz. 320, 323 ¶ 14 (2010) ("Contract law . . . seeks to preserve freedom of contract and to promote the free flow of commerce."). The "utmost liberty of contracting" has been described as a "paramount public policy." *Consumers Int'l, Inc. v. Sysco Corp.*, 191 Ariz. 32, 34 (App. 1997) (quoting *Wood Motor Co. v. Nebel*, 238 S.W.2d 181, 185 (Tex. 1951)). Moreover, although not directly implicated here, the framers of the Arizona Constitution drafted a provision supporting the general principle of contractual freedom in Arizona's Declaration of Rights in 1912. Ariz. Const. art. 2, § 25 ("No . . . law impairing the obligation of a contract[] shall ever be enacted.").

¶56 Conversely, the implied warranty of workmanship and habitability is of more recent vintage, tracing its roots to the 1979 court of appeals' decision in *Columbia Western Corp.* Today, we confront the very question that was expressly reserved in *Columbia Western Corp.*: whether parties may modify the implied warranty of workmanship and habitability with an express warranty. 122 Ariz. at 30 n.1 ("As the issue was not raised, we do not in this decision address the question as to what effect, if any, the existence of an express warranty may have in excluding or modifying implied warranties in this context.").

¶57 As explained in *Columbia Western Corp.*, the implied warranty of workmanship and habitability was judicially created to "eliminate a trap for unwary buyers who fail or are unable to secure an express warranty" and to "conform to the reasonable expectations of the vendee." *Id.* at 33 (quoting W. Durrell Nielsen II, Comment, *Caveat Emptor in Sales of Real Property Time for a Reappraisal*, 10 Ariz. L. Rev. 484, 491 (1968)). To that end, "the implied warranty of good workmanship serves as a 'gap-filler' or 'default warranty'; it applies unless and until the parties express a contrary intention." *Centex Homes v. Buecher*, 95 S.W.3d 266, 273 (Tex.

2002).[4]   And as this Court explained in *Balon v. Hotel & Restaurant Supplies, Inc.*, 103 Ariz. 474, 477 (1968), "[a] fictitious inference of law created to fill gaps in written contracts should not be held paramount over the express manifestations of intent of the parties."   Thus, the implied warranty of workmanship and habitability "should not be held paramount" where competent parties have agreed to modify the implied warranty with an express warranty.   *Id.*; *see also Consumers Int'l,* 191 Ariz. at 34 (describing parties' ability to contract freely as a "paramount public policy" (quoting *Wood Motor Co.*, 238 S.W.2d at 185)).

**¶58**        We recognize this Court's jurisprudence that "courts should rely on public policy to displace the private ordering of relationships only when the term is contrary to an otherwise identifiable public policy that clearly outweighs any interests in the term's enforcement."   *1800 Ocotillo*, 219 Ariz. at 202 ¶ 8; *see also Goodman,* 101 Ariz. at 474 (recognizing a "fundamental right of the individual to complete freedom to contract or decline to do so, as he conceives to be for his best interests, so long as his contract is not illegal or against public policy" (quoting *McCall v. Carlson*, 172 P.2d 171, 187 (Nev. 1946)).   But this Court has also explained that

> in the absence of a legislative declaration of what that public policy is, before courts are justified in declaring its existence[,] such public policy should be *so thoroughly established* as a state of public mind, *so united* and *so definite and fixed* that its existence is not subject to any substantial doubt.

*Ray v. Tucson Med. Ctr.*, 72 Ariz. 22, 36 (1951) (emphasis added).   Since its creation, this Court has applied the implied warranty in instances where the builder-vendor and homebuyer had *not* agreed to modify the implied

---

[4] *Centex Homes* was later superseded by statute when the Texas Legislature "created the Texas Residential Construction Commission and gave it rulemaking authority to create statutory warranties of workmanship and habitability as to new residential construction," and "[t]hese statutory warranties [became] exclusive and supercede[d] all previous implied warranties of workmanship and habitability."   *Gym-N-I Playgrounds, Inc., v. Snider*, 220 S.W.3d 905, 913 n.11 (Tex. 2007).   Indeed, the exclusive type of warranty available to parties is an issue better suited for the legislature to address. *Infra* ¶¶ 63–65.

warranty with an express warranty. This Court has never previously established a public policy that prohibits sophisticated parties in all cases from negotiating their own warranty terms—much less a public policy that is "so thoroughly established . . ., so united and so definite and fixed." *Id.* Thus, while "[t]he common law . . . is adopted and shall be the rule of decision in all courts of this state," A.R.S. § 1-201, the common law does not mandate the result today.

**¶59** In the majority's view, the type of contract a homebuyer enters into does not make a difference. The majority makes clear that *no* party under *any* set of circumstances may modify the implied warranty of workmanship and habitability—even if the homebuyer is sophisticated and seeks to purchase a customized home that presents specific risks, for which the homebuyer prefers to negotiate unique coverage in an express warranty. *See supra* ¶ 35. The majority further indicates that parties may still enter into an express warranty, so long as those terms are in addition to the implied warranty of workmanship and habitability. *See supra* ¶¶ 16, 20 (stating "if an express warranty is included in a purchase agreement, it may coexist with the implied warranty," but public policy prohibits enforcement of a disclaimer of the implied warranty). But what about a homebuyer who prefers a contractual term that is less protective than the implied warranty as to one section or component of the home, in exchange for greater and broader protection in another area of the home? What about a homebuyer's ability to negotiate a reduced purchase price in exchange for a warranty more limited than the implied warranty? Even here, Zambrano admits her express warranty may in some instances provide greater protection than the implied warranty, as a homebuyer may have a remedy under the express warranty (but not the implied warranty) if there are major structural defects after the statute of repose for the implied warranty has passed. In fact, Zambrano's express warranty covers one of the coverage groups for up to ten years against damages from certain variances in materials or workmanship, *supra* ¶ 5, whereas the statute of repose for the implied warranty is eight years, A.R.S. § 12-552(E)–(F). The majority replaces the parties' ability to determine their own best interests with an absolute prohibition on their ability to do so.

**¶60** Many other jurisdictions have rejected the categorical rule the majority employs today. *See, e.g., Turner v. Westhampton Ct., LLC*, 903 So. 2d 82, 93 (Ala. 2004) ("[T]he principle of freedom of contract permits a party to effectively disclaim the implied warranty of habitability."); *Greeves v. Rosenbaum*, 965 P.2d 669, 673 (Wyo. 1998) ("The protection afforded to purchasers of a new home, however, does not go so far as to

allow the purchasers to ignore *their* negotiated responsibilities."); *Tusch Enters. v. Coffin*, 740 P.2d 1022, 1030–31 (Idaho 1987) (explaining "[t]he majority of states permit a disclaimer of an implied warranty of habitability, but the disclaimer must be clear and unambiguous," and permitting disclaimer of the implied warranty in Idaho where the builder shows a knowing waiver); *Bridges v. Ferrell*, 685 P.2d 409, 410–11 (Okla. Civ. App. 1984) (explaining the Oklahoma Supreme Court's holding "that the implied warranty of habitability could be waived by the parties by agreement. . . . is in accord with the great majority of courts holding that while an implied warranty of habitability is a creature of public policy, a knowing disclaimer of the implied warranty would not be considered against public policy of [Oklahoma]"); *Crowder v. Vandendeale*, 564 S.W.2d 879, 881 n.4 (Mo. 1978) (explaining that, in Missouri, "one seeking the benefit of such a disclaimer [of the implied warranty] must not only show a conspicuous provision which fully discloses the consequences of its inclusion but also that such was *in fact* the agreement reached").

**¶61**　　　　The majority argues that Zambrano signed the "warranty with no variation to the preprinted terms in either document, without representation, and without any negotiation about warranties, suggesting she was in a take-it-or-leave-it situation." *Supra* ¶ 21. But there are already well-established legal remedies that could render a contract, including an express warranty, invalid and unenforceable. Indeed, courts decline to enforce contract terms (1) that are unconscionable or illegal; (2) where there was fraud, duress, coercion, misrepresentation, or mistake; and (3) where a contract of adhesion was unconscionable and outside the reasonable expectations of the parties. *See* A.R.S. § 47-2302 ("Unconscionable contract or clause"); *see also Maxwell v. Fid. Fin. Servs., Inc.*, 184 Ariz. 82, 88, 90 (1995) (providing that contract provisions "are unenforceable if they are oppressive or unconscionable" and noting that "claims under the doctrines of fraud, misrepresentation, duress, and mistake" may be pursued); *Goodman,* 101 Ariz. at 474 (recognizing "illegal" contracts as unenforceable); *Merrill*, 15 Ariz. at 531 (discussing "fraud, duress, coercion, or extortion"); *Broemmer v. Abortion Servs. of Phx., Ltd.*, 173 Ariz. 148, 153 (1992) ("Contracts of adhesion will not be enforced unless they are conscionable and within the reasonable expectations of the parties."). Therefore, by way of example, if a trial court determines a homebuyer's express warranty is invalid and unenforceable because it is unconscionable, then the implied warranty of workmanship and habitability would apply. *See Sirrah Enters.*, 242 Ariz. at 544 ¶ 8 (explaining the implied warranty "arises from construction of the home"

25

(quoting *Lofts at Fillmore Condo. Ass'n*, 218 Ariz. at 576 ¶ 13)). Here, Zambrano asserted a claim for "Breach of Contract" and a claim for "Breach of Implied Warranties." But Zambrano never asserted any such contractual defenses to the formation of her express warranty.

**¶62** We are not, as the majority claims, "[e]ffectively eliminating the implied warranty." *Supra* ¶ 27. We would continue to apply the implied warranty in cases where the parties have not otherwise agreed to substitute it with an enforceable express warranty. Moreover, contrary to the majority's claim, we would not "enforce a waiver and disclaimer provision even absent an express warranty." *Supra* ¶ 45. The very nature of the implied warranty is that it applies where there is no warranty at all.[5] *See Richards*, 139 Ariz. at 244–46 (extending implied warranty to subsequent purchasers lacking privity of contract with builder-vendor where record indicated no express warranty). Thus, where parties have a waiver and disclaimer provision that lacks an express warranty, this would mandate application of the implied warranty. *See 1800 Ocotillo*, 219 Ariz. at 202 ¶ 8 ("[C]ourts should rely on public policy to displace the private ordering of relationships only when the term is contrary to an otherwise identifiable public policy that clearly outweighs any interests in the term's enforcement.").

**¶63** In reaching today's decision prohibiting a waiver of the implied warranty, the majority focuses on policy matters that are better—

---

[5] We would apply the implied warranty as the limited "default" and "gap-filler" it was intended to be, recognizing that an assurance of workmanlike performance inheres in contracts for the exchange of goods or services that conforms to the reasonable expectations of the parties. *See, e.g.*, *Kubby v. Crescent Steel*, 105 Ariz. 459, 460 (1970) ("A contractor who undertakes to perform a contract in accordance with plans and specifications furnished by the contractee . . . must perform the work in a workmanlike manner and without negligence. A contractor impliedly warrants that he will perform in a workmanlike manner even though the contract itself does not contain an express warranty of good workmanship." (internal citations omitted)); *Cameron v. Sisson*, 74 Ariz. 226, 230 (1952) (explaining that "an implied warranty did arise" and "[i]t is incumbent upon a contractor who undertakes to build a structure or as in this case, a well, to do so in a manner befitting a skilled well-driller"); *see also* A.R.S. §§ 47-2314 to -2317 (granting and protecting implied warranties of merchantability and fitness for a particular purpose in the sale of goods).

and, as a matter of separation of powers, more appropriately—left for the legislature to address. The majority attempts to balance various interests of homebuyers and the public at large, supporting its decision by reasoning that: (1) "an implied home warranty is unique in protecting against financial catastrophe for homebuyers and community blight . . . . [P]oorly built homes are not easily discarded or replaced, and their impact can linger for decades," *supra* ¶ 34; (2) eliminating the implied warranty would "increas[e] the likelihood that homes would be left unrepaired, to the detriment of homebuyers, their neighbors, and the public generally," *supra* ¶ 27; and (3) the implied warranty "minimiz[es] the risk of catastrophic financial losses for all homebuyers," *supra* ¶ 25.

**¶64** In the context of homebuilding and homebuying, these are policy considerations better suited for the legislature to address, as we are not equipped to evaluate offsetting policy considerations such as the impact to home prices or other economic consequences to the public at large. Indeed, amici have presented competing policy considerations, including that a lack of predictability regarding homebuyer warranties has played a role in increasing home prices—an issue we are unable to consider because we are limited to the parties, facts, and arguments in this case. By contrast, the legislature routinely weighs these types of competing policy considerations. *See* Ariz. Const. art. 3 ("The powers of the government of the state of Arizona shall be divided into three separate departments, the legislative, the executive, and the judicial; . . . such departments shall be separate and distinct, and no one of such departments shall exercise the powers properly belonging to either of the others."). Moreover, the contours of the implied warranty of workmanship and habitability are nebulous and developed in the context of specific court cases, unlike the legislative process where competing interests and approaches are weighed, and clear and precise requirements can be adopted.

**¶65** This Court recently explained that a declaration of public policy is primarily a legislative function: "In Arizona, our primary source for identifying a duty based on public policy is our state statutes," and "in the absence of a statute, we exercise great restraint in declaring public policy." *Quiroz v. ALCOA Inc.*, 243 Ariz. 560, 566 ¶¶ 18–19 (2018) (rejecting a tort duty based on foreseeability); *see also Local 266, Int'l Bhd. of Elec. Workers v. Salt River Project Agric. Improvement & Power Dist.*, 78 Ariz. 30, 40–41 (1954) ("We have said that statements of public policy must be made by the people through the legislature."); *Ray*, 72 Ariz. at 35 ("The

declaration of 'public policy' is primarily a legislative function.").[6]   This Court has appropriately declined to declare public policy in the absence of legislative action in the area of torts.   We cannot reconcile the divergent approach today and would apply judicial deference to legislative policymaking in both contexts.

¶66        The legislature has recognized the existence of the implied warranty of workmanship and habitability by creating a statute of repose for such claims, § 12-552(E)–(F), and mentioning the implied warranty in the Purchaser Dwelling Act, A.R.S. § 12-1362(E).   We disagree with the majority's conclusion that all waivers of the implied warranty are prohibited and that parties must now wait for the legislature to expressly permit such waivers.   *Supra* ¶ 48.   The legislature has specifically prohibited waivers in other contexts.   *See, e.g.*, A.R.S. § 20-3214(D) ("The provisions of this chapter [regarding life insurance] may not be waived by agreement."); A.R.S. § 44-1615(A) ("The requirements and rights set forth in this article [regarding household goods movers] may not be waived."); A.R.S. § 44-1371(A) ("Any remedy for a violation of this section [regarding motor vehicle transactions] may not be waived, modified or limited by agreement or contract.").   The legislature, however, has *not* prohibited the waiver of the implied warranty.   This is significant and revealing.   The legislature knows how to prohibit waivers—and has prohibited certain waivers—but it has not prohibited a waiver of the implied warranty. Therefore, on the specific issue before us, it is unnecessary to wait for the legislature to expressly permit such waiver, as the majority contends here.

¶67        The legislature has not rendered the implied warranty non-waivable, nor has it mandated the implied warranty in all instances.   This is noteworthy because the legislature has extensively legislated in this area. For example, the legislature has required the Registrar of Contractors to establish "minimum standards for good and workmanlike construction." A.R.S. § 32-1104(A)(5); *see also* Ariz. Admin. Code R4-9-108(A)(B) (requiring builders, pursuant to legislative standards, to "perform all work in a professional and workmanlike manner" and "in accordance with any applicable building codes and professional industry standards").   The

---

[6] The majority's concern that homebuilders may exclusively start using express warranties and disclaiming the implied warranty altogether—a concern that is currently abstract and speculative—is likewise better suited for the legislature to address.   *Supra* ¶ 26.

legislature has also created mechanisms for resolving disputes in the homebuilding context, including through "Purchaser Dwelling Actions" and the filing of a complaint with the Registrar of Contractors; and, pursuant to legislative authority, the Registrar of Contractors has issued rules providing mechanisms for resolving disputes. *See* A.R.S. §§ 12-1361 to -1366 (addressing "Purchaser Dwelling Actions" permitting a homebuyer to sue a builder-vendor for defects involving the builder's "violation of construction codes," "use of defective materials," and "failure to adhere to generally accepted workmanship standards in the community"); A.R.S. §§ 32-1131 to -1140 (providing that homebuyer may file a complaint with the Registrar of Contractors and potentially recover money); §§ 32-1104(A)(5), -1105 (providing rulemaking authority for the Registrar of Contractors); A.R.S. §§ 32-1155 to -1169 (addressing regulation of contractors and construction contracts). The legislature has also created requirements for construction contracts, *see* A.R.S. §§ 32-1158, -1158.01, made certain provisions within construction contracts void and unenforceable, *see* A.R.S. § 32-1186, and clarified when performance may be suspended under a construction contract, *see* A.R.S. § 32-1185.[7]

**¶68** The majority also expresses concern that, if the implied warranty may be modified, subsequent purchasers of a home (who did not enter into an express warranty) may be left with no warranty at all. *See supra* ¶¶ 26, 46. This issue, however, is not before us, because: (1) Zambrano directly purchased her home from Scott Homes; and (2) there is nothing in this record to indicate Scott Homes recorded the waiver and disclaimer as a covenant, thereby giving notice to subsequent purchasers. Thus, this case does not present this unresolved issue and it should be left for another day. *See Richards*, 139 Ariz. at 245 (concluding subsequent purchasers can pursue claims against a builder-vendor for breach of the implied warranty, and explaining that "the purpose of a warranty is to protect innocent purchasers and hold builders accountable for their work" and thus "any reasoning which would arbitrarily interpose a first buyer as an obstruction to someone equally deserving of recovery is

---

[7] Zambrano argues the legislature's activity in this area has been primarily for the benefit of the builder, and that not much has been done for the benefit of the consumer. But, even if true, this is a policy choice made by the legislature, and it is not our place to alter that decision "based on our own notions of appropriate public policy." *Quiroz*, 243 Ariz. at 567 ¶ 20.

incomprehensible") (quoting *Moxley v. Laramie Builders, Inc.*, 600 P.2d 733, 736 (Wyo. 1979)).

¶**69** In conclusion, this Court previously held that "absent legislation specifying that a contractual term is unenforceable, courts should rely on public policy to displace the private ordering of relationships only when the term is contrary to an otherwise identifiable public policy that clearly outweighs any interests in the term's enforcement." *1800 Ocotillo*, 219 Ariz. at 202 ¶ 8. For the reasons previously stated, we would reject a sweeping rule that the public policy in favor of the implied warranty *in all cases* "clearly outweighs any interests in the . . . enforcement" of an express warranty to which parties agreed in the course of organizing their private affairs. *Id.* Trial courts are certainly capable of determining the enforceability of terms in an express warranty pursuant to the *1800 Ocotillo* standard and recognized contract defenses.

¶**70** Here, the trial court considered the *1800 Ocotillo* standard and rejected Zambrano's public policy arguments under this express warranty. The trial court concluded that: (1) Zambrano's "express warranty covers defined structural defects" for "two years more" than "an implied warranty claim;" (2) Zambrano "has not asserted that the ten year express warranty is insufficient in scope so as to fail to protect" Zambrano; and (3) Zambrano "failed to present any controverting evidence to support a conclusion that the waiver and express warranty allow the builder to avoid being held accountable for their work." We would affirm the trial court's grant of summary judgment in favor of Scott Homes on the implied warranty claim.